

**CRC Complaint # 02-HI-002**

James A. Barch
16101 Escobar Ave.
Los Gatos, CA 95032

April 1 to May 10, 2006

(408) 978-5727

Mr. Willie Alexander, Chief of External Enforcement
U.S. Dept. Of Labor, Civil Rights Center
Francis Perkins Building, Room N–4123
200 Constitution Ave., N.W.
Washington, D.C. 20210

Dear Mr. Alexander:

This report will prove – with clear references to the facts, evidence, and the law – that the Final Agency Action by CRC Director Annabelle T. Lockhart that denied my civil rights complaint on August 11, 2005 is so full of errors, omissions, and bias that it must be deemed completely invalid, and must be overturned and reversed in my favor.

I will have to send you my critique and rebuttal of Director Lockhart's Final Agency Action (FAA) in several installments. This is necessary for four reasons: A) because Director Lockhart's FAA contains so many errors, omissions, and instances of bias that must be rebutted; B) because even barely adequate rebuttal arguments require explanations much longer than each of Director Lockhart's original misstatements; C) because I am required to write documents and arrange mailings, filings, and service to meet court-related deadlines that will at times interrupt this lengthy rebuttal to the CRC; and D) because I am totally disabled, often totally unable, and my being forced to analyze in detail and type up at length this very traumatizing and upsetting experience, under stressful time-pressures, aggravates my medical condition and often forces me to lose one or more days to recuperate from my immediately preceding exertions.

1

Director Lockhart's FAA cannot be considered an accurate or balanced opinion. Not only is her FAA packed with errors and omissions; it is also biased because all of her mistakes favor the defendant and work to defeat me. Also, her selection of the facts is completely one-sided. She did not include a single point on which my complaint was correct. This fact reveals her lack of credibility and her intentional bias. It is simply not believable that out of my 100+ allegations and my 500+ pages of evidence that the defendants (in her view) did not violate my civil rights in the smallest way – not a single violation of law, administrative rule, ethics, or even a single instance of bad judgment by DLIR was admitted by Director Lockhart, despite evidence that proves such violations.

I will cite undeniable evidence that Director Lockhart has willfully ignored and omitted clear proofs that the defendants violated the law repeatedly, and thereby violated my legal and civil rights extensively, knowingly, and maliciously.

Similarly, I will show that most of the many false claims and conclusions that Director Lockhart made in her FAA are actually disproved by the evidence – and/or are unsupported by any evidence whatsoever.

This report will also prove that Director Lockhart's bias, errors, and omissions are part of a broader list of CRC personnel failures to honor the law, agency procedures, the facts, the evidence, and essential leads in the investigation of my civil rights complaint. One CRC investigator's (Mr. Bill Adams') aggressiveness, rudeness, and refusal to give me even the most basic information adds to the picture of a CRC team that treated me and my complaint with hostility, indifference, incompetence, and corruption regarding the facts, the evidence, and the law. In their mistreatment of me and my case, Mr. Adams, Director Lockhart, and the CRC have violated the laws and procedures that they are legally and morally sworn to uphold and enforce.

The fact that every single CRC investigator who handled my complaint, plus the CRC Director, committed clear violations of CRC policy, ethics, and laws strongly indicates, at the very least, a systemic problem within the CRC involving routine indifference,

2

incompetence, bias, and even corruption regarding the evidence and the law. The net result is that the CRC deprived me of an impartial, fair, and full investigation of my complaint in a timely manner. And consistent with that misconduct, the CRC Director deprived me of a fair and truthful Final Agency Action.

Thus, this report will prove that the number and duration of errors, omissions, and acts of knowing misconduct by the CRC staff are so numerous, outrageous, and fundamental that the CRC has compounded the State of Hawaii Labor Department's violations of my legal and civil rights by the CRC itself violating my legal and civil rights.

Therefore, I formally request that in addition to overturning Director Lockhart's false and fault-ridden decision, that you give a copy of this report to the official within the U.S. Labor Department whose legal duty it is to investigate violations of laws, procedures, and ethics by CRC investigators and the Director -- and to enforce disciplinary actions.

*          *          *

I will now support the above 2½ pages of truths with the following critique of the errors, omissions, and bias in Director Lockhart's Final Agency Action of August 11, 2005:

1) Director Lockhart stated that the CRC had "completed" its investigation of my complaint. No. The CRC simply "stopped" its investigation – abruptly and without it being "complete." The facts and evidence show that:

    A) The CRC was asked repeatedly by me to send essential interrogatories to DLIR witnesses about key events and facts – but CRC apparently failed to do so.

    B) The CRC was asked repeatedly by me to request or subpoena essential documentary evidence from DLIR – but CRC apparently failed to do so.

    C) The CRC was asked repeatedly by me to wait for my final evidence and "leads" for them – and to give me at least two weeks notice before CRC closed their investigation – but CRC failed to do so.



D) The CRC received my initial complaint in early January 2002. In late August 2005, I received Director Lockhart's FAA dated August 16, 2005. Thus, after <u>3¾ years</u>, the CRC not only had failed to give me their decision in a timely manner, but had also failed to obtain all of the necessary interrogatories from DLIR witnesses, failed to obtain all of the essential documentary evidence from DLIR, failed to wait for my final evidence, failed to ask me for my opinions and simply "adopted" (in the FAA!) DLIR's false and self-serving versions of events, failed to give me a fair and "complete" process, failed to treat me with even basic respect and responses required by DOL policies and procedures, failed to give me a fair and full FAA free of errors, omissions, and bias, and failed to give me truth and justice under the law.

E) Although the CRC received my initial complaint in early January 2002, the CRC did not notify me that they had accepted my complaint for investigation until late August 2002 (8½ months later). Along with Director Lockhart's letter to me dated August 15, 2002, were ten interrogatories that indicated the start of CRC's investigation. <u>It seems more than mere coincidence</u> that Director Lockhart's FAA is dated August 16, 2005 – <u>exactly 3 years</u> (plus one day) since the date that CRC began its investigation of my complaint. Given the facts I know, it seems that the CRC and Director Lockhart failed to "complete" their investigation, but rather arbitrarily, abruptly, and sloppily "closed" my case – simply to avoid the shame of taking more than 3 years to investigate my complaint.

F) You yourself, Mr. Alexander, gave me the distinct impression in our first phone conversation in September 2005, that the 3¾ years that CRC had possessed my complaint was not CRC's usual time-standard and was not considered acceptable by you; and that when you became CRC's Chief of External Enforcement, you instructed CRC staff to finish all the cases that were long overdue in an expedited manner. While I appreciate your concern with concluding cases that should have been genuinely completed long ago, I would rather have waited even another year in order to finally receive a full and fair investigation, and an accurate and just FAA.



Instead, it is evident that your instructions resulted in the CRC investigator(s) of my complaint arbitrarily stopping the investigation, failing to obtain additional and essential evidence and testimony, rushing to interpret the available "information" in a very sloppy way, making many misinterpretations, errors, and omissions – culminating in a thoroughly flawed FAA that deprived me of truth and justice – and lets DLIR "get away with murder" (of the laws, of my health, and of my entire life)!

G) Other facts and evidence support my charge that CRC did not "complete" their investigation of my complaint, but merely "stopped" it -- arbitrarily, abruptly, sloppily, improperly, and unfairly. I will describe the failure to follow CRC policies and procedures by CRC investigators Ms. Dorothy Perminter-Butler and Mr. William Adams (and his misconduct), and by CRC Director Lockhart, in a further installment of my critique of her FAA and CRC's treatment of me and my case.

2) In her FAA, Director Lockhart failed to mention other basic laws that are central to my complaint: the Americans with Disability Act (ADA), the Hawaii Revised Statutes (HRS), and the Hawaii Administrative Rules (HAR), etc. It is totally unacceptable that she made no reference to, or application of, these other relevant laws in her FAA. She only refers to "the Work Investment Act (WIA) of 1998, 29 CFR Part 37 and Section 504 of the Rehabilitation Act of 1973." Not only are these latter laws inadequate and too limited a focus for my case, but Director Lockhart makes very slight (and irrelevant) use of WIA. My case is not even an EEO type of case.

3) There is a fundamental conflict-of-interest in the U.S. Department of Labor (DOL) investigating alleged crimes by the Hawaii Department of Labor (DLIR). DLIR receives much of its operational funds from DOL. (By accepting these federal funds, DLIR is legally required to abide by federal, as well as state, laws.) But if DOL were to find DLIR guilty of the crimes alleged in my complaint, DLIR would be required to pay me financial compensation with DOL funds. DOL thus has an interest in finding DLIR not guilty, so that DOL can protect DOL funds. Thus, DOL has failed to provide me a full investigation of my complaint that is free of conflict-of-interest.

4) Director Lockhart knowingly misstated and misrepresented both the number and severity of my disabilities:

On my initial complaint form that I signed, dated, and mailed to CRC on January 4, 2002, I filled in the blank called "handicap" (i.e. disability) as "stress-injuries: mental & physical & behavioral disabilities" – on a form that did not provide enough space for a full list of my disabilities. In my cover letter, also dated January 4, 2002, I wrote "...my current disabilities, which includes Generalized Anxiety Disorder" – to explain why I was mailing CRC my complaint form and cover letter in triplicate from three different locations (i.e., because I was suffering from severe anxiety due to being mentally and physically abused by HBH and DLIR for over two years at that point).

At no time did I ever tell CRC that my disability was limited to Generalized Anxiety Disorder. In fact, in addition to my above two initial references to my multiple disabilities, I sent CRC documentary evidence in the fall of 2002 that included the 18 disability symptoms that I suffered at the time that DLIR began to knowingly aggravate and worsen my medical condition in December 2000. Most importantly, in April 2004, I sent CRC a notarized list of my 150 disability symptoms that DLIR had caused me from the chronic and acute stresses resulting from DLIR's ongoing violations of my rights since December 2000. (Now, in April 2006, the progressive, degenerative diseases that DLIR caused me to develop have worsened and increased my disability symptoms to nearly 200.)

Since Director Lockhart has access to (and presumably knowledge of) so many documents (including 100+ pages of my medical records in the ESARO record) that state the multitude and gravity of my disabilities and diseases, it is very untrue and unfair for her to grossly understate the number and severity of my disability as a single disorder – when she knows that is not true.

5) Director Lockhart also knowingly understated the number, duration, and severity of my charges against DLIR. Again, she refers to my initial complaint to CRC in

January 2002, but knowingly omits my many additional charges of DLIR violations of my legal and civil rights, that I sent to CRC in written reports and documentary evidence from the fall of 2002 through summer of 2005 (as well as in 2006).

For example, I informed CRC in writing that DLIR violated my central legal right to review my case records on May 2, 2001 to prepare for my final hearings on May 7-9, 2001. The hearing officer knowingly violated **HRS 383-95(a)** and **HAR 12-5-215**, both of which guaranteed my legal right to review my own records at DLIR. Proof that he knew of these two statutory rights that he violated on May 2, 2001 can be seen in his own letter to me just 15 days later, dated **May** 17, 2001 (see page 2683 of the ESARO record, in Exhibits at end). In that letter, he cited these two laws as giving me the legal right to access my records – but he sadistically twisted their meaning and continued to illegally deny and withhold access to my records by falsely telling me that my legal right to access my records ended once the hearings ended. (His illegal denial of my right to access was over-ruled a year later by DLIR Director Leonard Agor, DLIR Deputy Attorney General Frances Lum, and DLIR's other expert on laws governing DLIR, Mr. Tom Jackson.)

This same hearing officer, Mr. Thomas Rack, also violated the laws he cited to me, on December 28, 2000, **HRS 92 and 92F**, by which he stated that the case records could be reviewed by either party at any time. Yet he violated these two additional laws, and his explicit promise of access, the very first time I requested my legal right to access my records. Further proof of his criminal character and behavior is the fact that his letter to me dated December 28, 2000 was illegally omitted from the official ESARO case record, even though he swore to Circuit Court in writing that all evidence was submitted! I sent a copy of his letter to CRC. (See Exhibits at end.) I also told CRC that Mr. Rack's aide, Ms. Yvonne Katayama, witnessed this crime, and I asked CRC several times in writing to send interrogatories to Ms. Katayama -- but CRC apparently never investigated this fundamental violation by DLIR of my basic legal right to access my records. I also told CRC in writing that I had complained to the hearing officer's supervisor, Ms. Joyce Pang, *twice*, in late May

and early June 2001 – but that Ms. Pang had failed to reply and then failed to even mention, let alone investigate, this DLIR violation of my DLIR hearing process rights. Again, I asked the CRC in writing to send Ms. Pang (and Mr. Rack) interrogatories about this crime -- but, as in many other such instances – <u>CRC apparently failed to send interrogatories to Ms. Katayama, Mr. Rack, or Ms. Pang about *both* of these DLIR crimes</u>:  Mr. Rack's violation of my legal right to review my ESARO records, and Ms. Pang's multiple failures: to investigate my complaint of this crime, to uphold the law, to grant me access to copy my records, and for her to discipline Mr. Rack.

I also asked the CRC investigator (Ms. Dorothy Perminter-Butler) by phone and in writing to investigate two incidents from the Spring of 2002:

A) The two legal memoranda submitted to DLIR Director Leonard Agor by Deputy Attorney General Frances Lum and ESARO supervisor Joyce Pang, in which Ms. Pang revealed her violation of the HAR rule to maintain strict impartiality, and in which <u>Ms. Lum gave her legal opinion that both Ms. Pang and Mr. Rack had violated my legal rights</u> by refusing to give me access or copies of my case records -- which I needed to challenge Mr. Rack and Ms. Pang in state court. (This was another blatant <u>conflict-of-interest</u>:  Mr. Rack and Ms. Pang denied my written requests <u>13 times for an entire year</u> to prevent and delay my preparing and filing my opening brief in a timely manner in a challenge to Mr. Rack and Ms. Pang themselves!)  I asked CRC's Ms. Butler to investigate Ms. Pang's angry, personal violation of my legal rights (Ms. Pang reportedly got into an angry power-struggle with Ms. Lum for over a month), and to subpoena Ms. Lum's and Ms. Pang's written legal arguments (the memos to DLIR Director Agor) as evidence.  Once again, <u>CRC apparently failed to investigate</u> a proven crime, and <u>failed to obtain essential, "smoking gun" evidence</u> -- even when I asked CRC repeatedly to do so.

B) I also told CRC that one of DLIR Director Agor's top aides, Mr. Tom Jackson, who was one of DLIR's top experts on the ADA and other civil rights laws, had

been asked by Ms. Pang whether Ms. Pang and Mr. Rack had violated my legal and civil rights by denying me access to, and copies of, my case records 13 times for an entire year. I also told CRC that DLIR's Deputy Attorney General Lum had obstructed justice, suppressed evidence, and tampered with a legal expert by instructing Mr. Jackson to violate normal DLIR procedure by *not* giving his legal opinion to Ms. Pang in writing, but only orally. <u>Mr. Jackson's expert legal opinion was that Ms. Pang and Mr. Rack had violated my legal and civil rights</u>! I asked CRC's Ms. Butler to investigate these communications between Pang & Jackson, Pang & Lum, Lum & Jackson, and Jackson & Pang, and to send Mr. Jackson, Ms. Lum, and Ms. Pang interrogatories about these events and about Mr. Jackson's legal opinion. And yet again -- CRC's Ms. Butler apparently <u>failed to investigate</u> illegal and unethical misconduct by Ms. Lum, and <u>failed to obtain written testimony</u> by Mr. Jackson that DLIR's Ms. Pang and Mr. Rack had, in fact, violated my legal and civil rights! (Another "smoking gun" knowingly not obtained by CRC! Why not?)

6) <u>These examples (and there are many more) prove that CRC knowingly failed to investigate DLIR crimes against me, failed to subpoena essential evidence, failed to send interrogatories to several DLIR witnesses, failed to follow CRC rules and procedures, failed to conduct a fair and full investigation, and intentionally failed to find DLIR violations of law that undeniably prove my case. I request a full, independent investigation and explanation of CRC's incompetence and corruption.</u>

7) Director Lockhart states "based on the information gathered." Her choice of words suggests that she is intentionally omitting the fact that CRC has knowingly failed to "gather" and investigate extensive, additional information (DLIR witnesses that CRC needs to send interrogatories to, and essential DLIR documents that CRC needs to request from DLIR), that I requested CRC to obtain, repeatedly – vital evidence that Director Lockhart's "Final Agency Action" omitted and failed to even acknowledge exists, and utterly failed to consider.

8) Director Lockhart states that after her and the CRC's "review of an extensive amount of information submitted by the CP (Complainant)" that "I find that the evidence is insufficient…" This is a totally unbelievable claim. I submitted over 100 clear violations of law by the DLIR and over 500 pages of clear explanations and references to the evidence and the laws. It is inconceivable that such overwhelming evidence would be "insufficient" to a fair arbiter – and that not a single violation of law by DLIR was found by the CRC Director. Director Lockhart's credibility and reputation are going to be extremely damaged by an independent review of her outrageously untrue and unfair "decision" -- which will be seen to be a wholesale "whitewash" and "cover-up" that excused *numerous* crimes by the DLIR. I have already cited examples of undeniable violations of my legal and civil rights by the DLIR in this report. But in an upcoming report, I will list over 100 crimes by the DLIR that will make it clear and irrefutable that the DLIR violated my legal and civil rights.

9) Director Lockhart states "that the evidence is insufficient to support a finding that the Respondent (HDOLIR) discriminated against the CP or retaliated against him on the basis of disability when it denied him unemployment benefit."

First, this claim is utterly false, as an independent review of the evidence will prove. (DLIR discrimination and retaliation against me are proved by evidence that CRC possesses, plus evidence that I am in the process of submitting to CRC, plus evidence I asked the CRC to wait for but that the CRC failed to wait for, plus evidence I repeatedly asked CRC to obtain but that CRC knowingly failed to obtain.)

Second, Director Lockhart's statement is too limited. The proper legal question is whether DLIR violated *any* of my legal and civil rights *during the entire duration* of its dealings with me and CRC. Current evidence shows (and new evidence will show) that DLIR did violate my legal and civil rights -- on numerous bases over a prolonged duration -- not merely on the basis of my disability, not merely on the basis of denying me benefits, and not merely on the basis of discrimination and retaliation.

All of these types of violations occurred, but many more types of violations also occurred.

Even DLIR's own Deputy Attorney General, Frances Lum, wrote a memo in Spring 2002 to DLIR Director Agor, stating her legal opinion that Mr. Rack and Ms. Pang had violated my legal rights. Also, DLIR's own expert on ADA and civil rights laws, Mr. Tom Jackson, told Ms. Pang orally that she and Mr. Rack had violated my civil rights. <u>How clear can it get when DLIR's own legal experts state that DLIR's officers violated my legal and civil rights</u>?

And how does Director Lockhart explain or excuse her and CRC's failure to obtain and consider these <u>two</u> admissions of guilt by the DLIR — especially when I asked *repeatedly* for the CRC to obtain Ms. Lum's and Ms. Pang's <u>memos</u> to Director Agor, and to send <u>interrogatories</u> to Ms. Lum, Ms. Pang, Mr. Agor, and Mr. Jackson about DLIR's own findings of DLIR violations? CRC's investigation and Director Lockhart's Final Agency Action is clearly "based on" "insufficient" competence and honesty by CRC! CRC and Director Lockhart knowingly failed to "gather" all of the evidence and to consider all of the essential "information." I request a full explanation for this.

10) Director Lockhart's FAA erred about an important basic date: I was employed by Hawaii Behavioral Health (HBH) through October 14, 1999 -- not October 16, 1999. (The importance of her mistake will be explained in # 13 & # 14 on pages 14 & 15.)

11) Director Lockhart grossly misinterprets and misrepresents the medical facts and my actual situation by misstating that "the evidence indicates that the CP voluntarily quit his job..."

On the contrary, the evidence shows that I fought desperately to keep my job and my income for several months, during which time I incurred the total disability that I have suffered permanently ever since I quit the job. Thus, I quit the job due to my health being damaged severely from the injuriously stressful work conditions and

from the injuriously stressful gross negligence and intense abuse from my bosses. The evidence shows that I was forced to quit my job "involuntarily" due to "constructive termination" by my bosses, who were trying to force me to quit my job by verbally abusing me; by withholding cases from me that I needed to meet my employer's demand of a weekly "quota" of billable hours; by falsely accusing me of *numerous* things (that my driver's license was expired, that my car insurance was expired, that my billable hours were $1/10^{th}$ of what they really were, that my billing was fraudulent, etc. -- *none of which was true!*); by abruptly changing my pay from salary to hourly without any notice; and so on.

The ESARO hearings transcript and records also show that HBH's 4 main witnesses committed acts of written fraud and oral perjury about my bosses' "constructive termination" withholding of cases I needed to meet my job quota, etc. -- and that DLIR hearing officer Rack repeatedly failed to question the perpetrators about it, and even concocted his own twisted "cover-up" for one witness who was forewarned by me not to withhold testimony, and to honor her oath to "tell the whole truth," but who proceeded to claim "I don't remember" about 50 times!   She was caught just minutes afterward contradicting her agreement to Mr. Rack's illogical and illegal suggestion to the witness that "when you say 'I don't remember' you really mean 'It never happened'."  (How can Director Lockhart's FAA omit such blatant violations?)

Most important of all, the evidence shows that I was forced to quit my job "involuntarily" due to the health problems that the work conditions and my bosses' abuse of me were causing me.  My medical records show that for six entire months before I quit my job, I was suffering chronic and worsening damage to my health -- and that at the time I quit my job I was so sick that I was on antibiotics for an entire month after I quit.  Overwhelming proof that I was forced to quit my job involuntarily due to health problems that were caused by my job and my bosses is this documented fact that no one disputes:  <u>I have been totally disabled ever since my last day of work at HBH and I have never been able to work a job since October 14, 1999.</u>  That is 6½ years now.

I am officially certified as totally disabled for the rest of my life – by my primary physician who has treated me for 4 years, and by the U.S. government.

<u>The Hawaii Revised Statutes (HRS) state that quitting one's job due to health reasons is considered "good cause," that makes the quitting employee eligible for unemployment benefits</u>. This is the central employment law (as distinct from many other legal and civil rights) that the DLIR knowingly violated – and one of many major violations of my legal and civil rights by DLIR that Director Lockhart knowingly committed errors about in her FAA.

12) Director Lockhart also erroneously states that I voluntarily quit my job at HBH "for personal reasons."   By knowingly misstating and grotesquely understating my job-caused total and permanent disability as "personal reasons" instead of "health reasons," Director Lockhart has intentionally joined with the defendants in not only trying to deprive me of my original eligibility for unemployment benefits, but also in trying to deprive me of much greater financial compensation due to DLIR violating my legal right to unemployment benefits, DLIR violating my legal and civil rights extensively from 2000 through 2003 and on to now, 2006, and due to DLIR intentionally inflicting physical, mental, and emotional duress on me that has resulted in much more numerous and serious disabilities and diseases that are permanent, incurable, and steadily worsening.  DLIR destroyed my health and stole my life – and Director Lockhart is covering it up and letting the defendants "get away with murder" (of my legal rights, my health, and my life).

Director Lockhart has no legitimate facts or evidence on which to base her misrepresentation that I "voluntarily" quit my job "for personal reasons." I <u>demand</u> her explanation of:

A) Why she knowingly disregarded and omitted the medical evidence of how sick I was for 6 months before I quit my job, at the exact time I quit my job, and for an entire month after I quit my job – especially when she read my medical records.

13

B) Why she knowingly disregarded and omitted the medical evidence of how six independent doctors, the State of Hawaii Department of Human Services, and the U.S. Social Security Administration all certified me as being totally disabled since October 14, 1999 – the day I was forced to quit my job for <u>health</u> reasons.

C) Exactly what were my "personal reasons" for quitting my job.

D) From what specific evidence did she derive my alleged "personal reasons."

13) Director Lockhart's FAA is also in error by stating October 16, 1999 as the date I "filed an initial claim for Unemployment Insurance (UI) benefits." By her mistake, she makes the very false insinuation that I applied for benefits the very same day that she (also erroneously) claims that I quit my job "voluntarily." This is a very serious misrepresentation of the actual dates – and of the very grave circumstances of my life.

The facts are that I was forced to quit my job involuntarily on October 14, 1999 due to health problems that have continued and worsened since, and that are now permanent and total disabilities and degenerative diseases. As I stated above, at the time I quit my job at HBH I was severely ill. I was mostly bed-ridden for the entire month after I quit my job. And I was so severely depressed (and as I know now, my immune system had been severely damaged and my entire body had been totally disabled) that I was mostly house-bound and literally suffering in the dark for the rest of 1999 (2½ months)!

Contrary to Director Lockhart's misstatement, I did <u>not</u> "file an initial claim for Unemployment Insurance (UI) benefits" until fully 91 days after I quit my job – that is, I did not apply for UI benefits until January 13, 2000. This delay of 91 days is further <u>proof</u> that I was totally disabled by my job at HBH, and have been totally disabled ever since I quit HBH on October 14, 1999. It took me over 3 months to recover enough mentally and physically to even ask the State of Hawaii to help me

financially. But tragically for me, instead of helping me financially, the State of Hawaii's DLIR violated my legal and civil rights, and destroyed my health and life catastrophically and permanently, and have doomed me to a lifetime of poverty!

14) Director Lockhart apparently got her erroneous date of my last day at HBH as October 16, 1999 from my initial claim form for UI benefits on January 13, 2000. I wrote "October 16?, 1999" on the form because I was so mentally and physically disabled, and my memory or knowledge of the exact date of my last day at the job 2½ months before was not yet etched in my mind. This form was the very first time I needed to remember that date. But Director Lockhart was still responsible for her mistake because the question mark following October 16 clearly required her to verify the accuracy of the date, and she supposedly reviewed many key documents I submitted to both DLIR and CRC in which I stated the correct date of October 14, 1999 as my last day at HBH. More importantly, Director Lockhart was still mistaken to state October 16, 1999 as the date of my claim for UI benefits, when "1-13-00" is clearly written as the "date" by my signature on both pages of my claim form. (See pp.2946-7 in Exhibits.)

15) Director Lockhart misstated that on my application for UI benefits I claimed that I was forced to quit my job because I was subjected to mistreatment from my bosses. Her summary is imprecise. I was forced to quit my job for health reasons. My health crisis was caused by chronically abusive and negligent mistreatment of me by my bosses, and by chronically stress-injuring work conditions. Director Lockhart intentionally avoided stating that I quit for health reasons because that is exactly what Hawaii state law says would make me eligible for the unemployment benefits that DLIR illegally denied me. Director Lockhart is helping DLIR evade legal and financial liability by covering-up the truth and omitting the evidence.

16) Director Lockhart contradicted herself in her very next sentence by admitting that I had stated that I quit my job because my health was deteriorating. Actually, I wrote that "The accumulated (chronic & acute) stress was making me physically sick – so I

quit to restore my health & sanity." By these words, I clearly stated that I quit my job for both physical and mental health reasons. Thus, I was eligible for the benefits that DLIR illegally denied me.

17) Outrageously, Director Lockhart ends her sentence by saying that I further stated (supposedly on my initial claim form for UI benefits) that I was "not disabled." False!

A) <u>Nowhere</u> on the 2-page UI claim form dated 1-13-0O (that she erroneously states as October 16, 1999) did I ever write that I was "not disabled." (See pp. 2946-7, in Exhibits at end.)

B) <u>Why did she make this false claim, if it is not on the form that she says it was on</u>?

C) What is she clumsily trying to imply? And <u>why does she make insinuations, instead of making clear statements and conclusions that she then supports with solid evidence and logical reasoning? Her FAA is flawed in this way throughout.</u>

D) Contradicting herself again, she had just written in her FAA, two paragraphs before, that "at the time the alleged discrimination occurred; that the CP was an individual with a disability; and the Respondent was aware of the CP's disability."

E) Also, Director Lockhart had possession of (and knowledge of) many documents from many doctors and government agencies (including DLIR's UI division) that certified that I was disabled since the day I quit my job, October 14, 1999.

F) Additionally, Director Lockhart's job history on the DOL website describes her as having over 25 years of work experience at the DOL -- and as being the Director of the DOL's Civil Rights Center for over 12 years. As such, she is supposed to enforce the Americans with Disabilities Act, among other civil rights laws. Presumably, she has handled many cases involving disabled Americans.

With her many years of experience and knowledge involving disabled citizens, it is inconceivable that she would not know that:

1) Disabilities in mental, emotional, and physical functions often do not manifest clearly and all at once.

2) Disabilities in mental, emotional, and physical functions often do not manifest until the person is in situations that require them to exercise specific functions.

3) People whose disabilities include mental dysfunctions (as mine do), often are not aware of any or all of their disabilities until repeated experiences of dysfunction make them realize that their lifelong abilities have been damaged.

4) Even with this realization, it often takes even longer for a disabled person's self-conception to consistently remember that these unwanted changes and losses of ability are now a part of ones "new" self.

G) CRC and Director Lockhart have possession of a note from my doctor, Shepard Ginandes, who essentially stated that many disabilities from job-stress injuries often do not manifest during the job, but can manifest gradually after the job. I definitely sent CRC this doctor's note, in Fall 2002 I believe. (See Exhibits.)

H) Another reason I did not write on my initial claim form for unemployment benefits on 1-13-00 that I was "not disabled" (as Director Lockhart falsely claimed), is that I wasn't even thinking about disability. I did not know yet that I was disabled. Partly this lack of self-awareness was due to my cognitive disabilities -- and partly this was due to my not yet trying to get a new job (and trying to use my past abilities), which is how and when I started realizing that I had been disabled.

I) If I had known I was disabled, I would not have even applied for unemployment benefits, and I would not have made "good faith" efforts to find a new job for two entire months. Instead, I would have applied for State Disability Insurance Benefits, first and foremost. The fact that I did not is _proof_ that I did not know when I applied for unemployment benefits that I was disabled and unable to work. I only became aware of my disabilities as I tried to get a new job, and then experienced more and more dysfunctions that I never had before.

18) Director Lockhart stated that DLIR knew I was disabled. But she omitted that DLIR had been warned in writing by my doctor that my total disability made proceeding with the hearing process "medically contra-indicated," and requested Ms. Pang to postpone my hearings – and that Ms. Pang recklessly disregarded my doctor's medical opinion and request. As warned, my health was damaged by DLIR forcing me to proceed with the very stressful pre-hearing on December 14, 1999 (which lasted over 2 hours), and the ensuing hearing process (which lasted 6 months), including a very stressful number and frequency of lengthy documents DLIR forced me to prepare and submit to DLIR on a very tight schedule. How can Director Lockhart omit the "smoking gun" letter from my doctor to Ms. Pang on 12-6-00? (See page 1941 in the Exhibits -- and in the ESARO record.)

19) Director Lockhart also knowingly omitted that DLIR's Ms. Pang also recklessly disregarded the legal opinion of DLIR's own expert on the ADA and civil rights laws, Mr. Tom Jackson, who told Ms. Pang that ADA and civil rights laws required Ms. Pang to postpone my hearings "for as long as Mr. Barch's medical condition requires." Ms. Pang got angry, did not maintain her legally required "impartiality," and failed to postpone my hearings until I was medically ready. As a result, DLIR damaged my health catastrophically and permanently!

20) Director Lockhart also knowingly failed to state that DLIR's Mr. Rack reviewed hundreds of pages of my medical records in February 2001, and thereby learned in extensive detail what I and my doctor and my previous medical and legal documents

had told Mr. Rack and Ms. Pang: that I was totally disabled, my disabilities were numerous and severe – and I was too sick to undergo the extreme stress and fatigue of the hearings without endangering my health!  Legally and ethically, Mr. Rack had a _duty_ to postpone my hearings once he read my medical records – but he intentionally and recklessly disregarded my medical records, my medical needs, and my legal and civil rights under the ADA, HRS, HAR, and other civil rights laws.

21)  Director Lockhart also knowingly omitted that DLIR's **Mr.** Rack and Ms. Pang had numerous laws that required them to postpone my hearings based on my total disability legal and medical status – and not a single law that required them to force me to proceed with the hearings, and thereby suffer permanent, catastrophic damages to my health and my life.

22)  The CRC apparently failed to send interrogatories to Mr. Rack and Ms. Pang asking them the legal basis of their repeated, consistent denial of my requests to postpone my hearings (especially throughout the entire month of December 2000) – or asking them the legal basis of their reckless insistence on forcing me to proceed with the hearing process before I was medically ready.  Mr. Jackson told that he did not know why Mr. Rack and Ms. Pang were forcing me to do the hearings – but since there was no state law or agency rule that required them to hold my hearings, Mr. Jackson felt that they must be forcing me as a "political" favor to some third party.  But again, CRC apparently failed to ask Mr. Rack, Ms. Pang, or Mr. Jackson about Mr. Rack's and Ms. Pang's motives and behavior – which Mr. Jackson told me were very unusual.

I will continue further installments of my detailed rebuttal of the errors, omissions, and bias in CRC Director Lockhart's FAA in one or two weeks (for the reasons I stated on page one of this letter).

Sincerely,

_James A. Barch_

James A. Barch

EXHIBITS SECTION



BEN_JAMIN J. CAYETANO
GOVERNOR

LEONARD AGOR
DIRECTOR

AUDREY HIDANO
DEPUTY DIRECTOR

JOYCE PANG
APPEALS OFFICER

## STATE OF HAWAII
### DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS
### EMPLOYMENT SECURITY APPEALS OFFICE
830 PUNCHBOWL STREET, ROOM 429
HONOLULU, HAWAII 96813
Telephone No.: (808) 586-8930

May 17, 2001

Mr. James A. Barch
P.O. Box 161042
Honolulu, HI 96816

Dear Mr. Barch:

          Re    Case No. 00-00327
                 James A. Barch, Claimant-Appellant
                 Hawaii Behavioral Health, Employer-Appellee

This is in response to your facsimile letters dated May 14, and 16, 2001 regarding your request to copy the tapes of the May 7th, 8th, and 9th, hearings and to review the case file.

Hawaii Revised Statutes Section 383-95(a) permits disclosure of the materials in the file "... to the extent necessary for the proper presentation of the claimant's claim in any proceeding under this chapter." Hawaii Administrative Rule 12-5-215 contains similar provisions. Accordingly, the information in the files and the tapes may be available for the purpose of assisting in the preparation and presenting of the appeal before this office. Since the hearing in this case is now closed, the need to prepare for this matter is moot.

While you may believe that an appeal to the Circuit Court will be filed, such a belief is mere speculation.

If a Circuit Court appeal is filed, the Court will want citation to specific portions of the hearing transcripts. Accordingly, copies of the tapes will be of little value since the parties will need to refer to specific pages of the transcripts. Likewise, the documents in the Record Of Appeal ("ROA") will be numbered and the Court will expect references to the specific portions of the ROA being cited by the parties. If an appeal is, in fact, filed,

268

Mr. James A. Barch
Page Two
May 17, 2001

you and Employer's counsel will need to review the transcript and ROA to determine what testimony or evidence is necessary for the appeal.  Therefore a copy of the tapes and/or review of the file, at this time, will be of little assistance in drafting a brief for the Court.

Based upon the foregoing reasons, your request to copy the tapes and/or review the file is denied.

Very truly yours,

THOMAS P. RACK
Appeals Officer

c:   Sarah O. Wang, Esq. (w/ enclosures)
     Marr, Hipp, Jones & Pepper
     1001 Bishop Street, 1550 Pauahi Tower
     Honolulu, HI 96813

2684



BENJAMIN J. CAYETANO
GOVERNOR

LEONARD AGOR
DIRECTOR

AUDREY HIDANO
DEPUTY DIRECTOR

**STATE OF HAWAII**
DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS
EMPLOYMENT SECURITY APPEALS OFFICE
830 PUNCHBOWL STREET, ROOM 429
HONOLULU, HAWAII 96813
Telephone No.: (808) 586-8930

JOYCE PANG
APPEALS OFFICER

December 28, 2000

Mr. James A. Barch
P.O. Box 161042
Honolulu, HI 96816

Dear Mr. Barch:

   Re: Case No. 0000327
     Appellant: James A. Barch
     Appellee: Hawaii Behavioral Health LLC

  This is in response to your letter dated December 21, 2000 regarding subpoena requests for your Appeals hearing.

  As you were advised during the December 14th hearing, you need to submit the name, home and business address, home and business telephone numbers of each person for whom you wish to subpoena. In addition, you need to provide a brief statement as to why this particular witness is necessary indicating what points or issues this person will testify to at the hearing.

  In accordance with Hawaii Revised Statutes (HRS) Section 91-10, we need to evaluate the nature and necessity of the requested witness' testimony. For example, if seven witnesses would all testify to the same fact, their testimony would be cumulative. Therefore, it is unlikely that our office would approve all seven subpoena requests since the information needed could be obtained from one or perhaps two witnesses.

  The requests for subpoenas will become a part of the file and either party is free to review the file at any time. As provided by Hawaii Revised Statutes Chapters 92 and 92F, accordingly, you could review Employer's subpoena requests, if any are filed.

Mr. James A. Barch
December 28, 2000
Page Two


  If any subpoena requests are denied, you will be informed of the reason(s).  If you disagree with said reasons, you will be permitted to place your objections to the same on the record at the hearing.  However, our office will not engage in repeated pre-hearing debates as to alleged necessity of witnesses.  Therefore, you should clearly state your reasons why each particular witness is necessary at the time the subpoena request is submitted.

  Enclosed is a copy of the pre-hearing order setting forth the scheduling for this matter.

         Very truly yours,


         THOMAS P. RACK
         Appeals Officer


TPR:eif

Enclosure

c: Sarah Wang, Esq.

UC-BP-123
(Rev. 8/98)

PAGE 1 OF 2

Case 1:04-cv-00712-SOM-BMK    Document 20-6    Filed 09/01/2006    Page 25 of 28

OFFICE USE:
Uncovered: _____
Referred: _____

## CLAIMANT SEPARATION STATEMENT

_JAMES A. BARCH_                    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
          (Name)                                    (Social Security Number)

I was employed by _HAWAII BEHAVIORAL HEALTH_ as a _THERAPIST_
          (Name of Employer)                              (Work Performed)

I worked from _NOV. 4, 1998_ to _OCT. 16?, 1999_ . My immediate
supervisor was _RAELYNN HILLHOUSE_ . His/Her position is _QUALITY ASSURANCE ?_

**THE FOLLOWING INFORMATION IS NECESSARY BEFORE A CORRECT DECISION CAN BE MADE ON YOUR UNEMPLOYMENT CLAIM. IT IS TO YOUR ADVANTAGE TO GIVE A COMPLETE DETAILED STATEMENT.**

I am no longer employed by this employer because: ☑ Quit        ☐ Discharged by
                                                                                  (Name)

I ☑ Quit  ☐ was Discharged. (Please explain WHY in full details: Include names, dates, final incidents, warnings, attempts to resolve problem, results and any other relevant information.)

_I HAD BEEN ONE THE MOST PRODUCTIVE THERAPISTS AT HBH FOR 6 MONTHS ON KAUAI. I TRANSFERRED THE SAME JOB WITH HBH TO OAHU, BUT WAS NOT INFORMED BY HBH THAT THIS SAME JOB SUFFERED 100% TURNOVER ON OAHU, OR THE MANY PROBLEMS AT HBH-OAHU THAT CAUSED ALL THE THERAPISTS TO QUIT SO OFTEN. I IMMEDIATELY EXPERIENCED THESE PROBLEMS (WITH CLIENTS, THE STATE WORKERS, AND HBH STAFF AND MANAGEMENT ON OAHU). EVERY WEEK FOR SEVERAL MONTHS, I TRIED TO TALK WITH RAELYNN HILLHOUSE ABOUT MY JOB PROBLEMS, BUT SHE WAS ALWAYS "TOO BUSY" TO GIVE ME HER TIME AND ATTENTION. FINALLY, AFTER 5 MONTHS ON OAHU, RAELYNN ERRONEOUSLY MISCALCULATED MY PRODUCTIVITY LEVELS AND WITHOUT DISCUSSION OR WARNING CUT MY HALF-TIME SALARY TO HOURLY, FULLY AWARE THAT HER ACTION WOULD BE UNLIVEABLE FOR M_

— DO NOT WRITE ON THE BACK OF THIS FORM. IF YOU NEED MORE SPACE, ASK RECEPTIONIST FOR ADDITIONAL SHEET(S).

_(PLEASE SEE ADDITIONAL SHEET_

**I HAVE MADE THIS STATEMENT FOR THE PURPOSE OF OBTAINING UNEMPLOYMENT BENEFITS , KNOWING THAT THE LAW PROVIDES PENALTIES FOR FALSE STATEMENTS OR WITHHOLDING OF INFORMATION.**

DATE: _1-13-00_        YOUR SIGNATURE _James Barch_

**OFFICE USE ONLY**

☐ NO DISQUALIFICATION        ☐ CHARGE CODE        SECTION 383 _____

DATE OF COMPLETION    CE INITIAL

4

2946

UC-BP-123
(Rev. 8/98)

PAGE 2 OF 2

**CLAIMANT SEPARATION STATEMENT**

OFFICE USE:
Uncovered: _____
Referred: _____

JAMES A. BARCH
(Name)

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
(Social Security Number)

I was employed by ~~HAWAII BEH'L HEALTH~~ as a THERAPIST
(Name of Employer)                          (Work Performed)

I worked from NOV. 4, 1998 to OCT. 16? 1999. My immediate
supervisor was RAELYNN HILLHOUSE. His/Her position is QUALITY ASSURANCE?

THE FOLLOWING INFORMATION IS NECESSARY BEFORE A CORRECT DECISION CAN BE MADE ON
YOUR UNEMPLOYMENT CLAIM. IT IS TO YOUR ADVANTAGE TO GIVE A COMPLETE DETAILED
STATEMENT.

I am no longer employed by this employer because:  [✓] Quit        [ ] Discharged by
                                                                            (Name) _____

I [✓] Quit  [ ] was Discharged  (Please explain WHY in full details: Include names, dates, final incidents,
warnings, attempts to resolve problem, results and any other relevant information.)

WHEN I PLEADED TO BE GIVEN ONE MORE WEEK TO MEET MY
HBH REQUIRED QUOTA, RAELYNN REFUSED! SHE KNEW SHE WAS
CAUSING ME EMOTIONAL DURESS, FINANCIAL CRISIS -- AND WAS
PRESSURING ME TO QUIT. (I HAD SEEN HER TAKE SIMILAR
ACTIONS THAT HAD FORCED ANOTHER THERAPIST, DR. JIM PHILIPS,
TO QUIT.) ALSO, RAELYNN'S "PROXIE" (OFFICE MGR. MICHELLE
DORMAN) BEGAN SPEAKING TO ME EXTREMELY AGGRESSIVELY, HOSTILELY, &
DISRESPECTFULLY. AND EVEN THOUGH WITHIN THAT ONE WEEK,
I MET & EXCEEDED MY QUOTAS (AND RAELYNN REALIZED HER
GROSS UNDERESTIMATION OF MY PRODUCTIVITY)--RAELYNN'S &
MICHELLE'S TREATMENT OF ME REMAINED EXTREMELY ABUSIVE
& DEMEANING. THE ACCUMULATED (CHRONIC & ACUTE) STRESS WAS

– DO NOT WRITE ON THE BACK OF THIS FORM. IF YOU NEED MORE SPACE, ASK RECEPTIONIST FOR
ADDITIONAL SHEET(S).

MAKING ME PHYSICALLY SICK -- SO I QUIT TO RESTORE MY HEALTH & SANITY

I HAVE MADE THIS STATEMENT FOR THE PURPOSE OF OBTAINING UNEMPLOYMENT BENEFITS, KNOWING
THAT THE LAW PROVIDES PENALTIES FOR FALSE STATEMENTS OR WITHHOLDING OF INFORMATION.

DATE: 1-13-00        YOUR SIGNATURE  *James Barch*

OFFICE USE ONLY
[ ] NO DISQUALIFICATION    [ ] CHARGE CODE    SECTION 383 _____

DATE OF COMPLETION    CE INITIAL

294

# SHEPARD GINANDES, M.D.

### Diplomate, American Board of Psychiatry

*Psychiatry • Hypnosis • Forensic Psychiatry*
1188 BISHOP STREET, SUITE 2405 • HONOLULU, HAWAII 96813 • TEL: (808) 528-4125

8-13-01

As treating physician for James Barch, and having been in the clinical practise of psychiatry for over fifty years, I can attest that I have seen many patients with severe job stress, are able through conscientiousness and a sense of duty, to repress all signs of even severe stress symptoms and to carry on for long periods. Usually some job event is the precipitant for loss of that control and the true disability then becomes clear, as in the case of James Barch.

Note-- In some cases symptoms do not manifest until the employee has left the job.

Tax ID# 99-0312856

INDIVIDUAL

*STATE OF HAWAII,*
*City and County of Honolulu.* } ss:

On this 16th day of August, A.D. 2001, before me personally appeared SHEPARD GINANDES, M.D.

to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

Notary Public, Amalia P. Ungos
State of Hawaii.

My Commission Expires ..........

**GENE ALTMAN, M.D., INC.**
SUITE 507 KAHALA OFFICE TOWER
4211 WAIALAE AVENUE
HONOLULU, HAWAII 96816
TELEPHONE (808) 732-7177

DLIR
APPEALS OFFICE
Dec 7  1 56 PM '00

12/6/00

ATTN: Joyce Pang
Chief Referee
Employment Security Appeals
    Referees Office

Dear Ms Pang.

I have seen Mr. James Basch today for evaluation of his current mental status. I saw him previously in August of this year. He is currently experiencing severe symptoms of Major Depression and probable Post-traumatic Stress Disorder, including emotional depression, cognitive impairment, agitation. He is medically unable to prepare for or participate in an appeal hearing due to his condition at this time. He will require a period of effective treatment and recovery before he would be able medically to carry out the above. Having to undergo the stress of a hearing is medically contra-indicated for him at this time. He is currently certified as totally disabled by the SSA and the State of Hawaii Dept. of Human Services, and I concur with this. With regard to Mr. Basch's best medical interests, please postpone his 12/14/00 hearing. Thank you

Sincerely,

Gene Altman

1941