James A. Barch

16101 Escobar Avenue

Los Gatos, CA 95032

(408) 978-5727

Plaintiff Pro Se

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 2 9 2006

at _____ o'clock and ____ min. ____ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JAMES A. BARCH, | ) | CIVIL NO. 04-00712 SOM-BMK |
| Plaintiff, | ) | (Other Civil Action) |
| vs. | ) | |
| | ) | PLAINTIFF PRO SE'S AMENDED |
| STATE OF HAWAII DEPARTMENT OF LABOR | ) | COMPLAINT; SUMMONS; |
| & INDUSTRIAL RELATIONS; | ) | CERTIFICATE OF SERVICE |
| Defendants. | ) | |

Hearing:

Date: _____

Time: _____

Judge: Hon. Susan Oki Mollway

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


JAMES A. BARCH,                               )    CIVIL NO. 04-00712 SOM-BMK

            Plaintiff,                  )    (Other Civil Action)

    vs.                                      )

                                  )    PLAINTIFF PRO SE'S AMENDED

STATE OF HAWAII DEPARTMENT OF LABOR )    COMPLAINT

& INDUSTRIAL RELATIONS;                       )

           Defendants.                  )


PLAINTIFF PRO SE'S COMPLAINT


I.    Introduction


Plaintiff Pro Se, James A. Barch, (hereafter "Plaintiff"), alleges that several government officials within, or under, the State of Hawaii's Department of Labor and Industrial Relations (hereafter "Defendant" or "DLIR") knowingly, intentionally, and maliciously violated numerous Federal laws, Hawaii Revised Statutes, Hawaii Administrative Rules, and DLIR policies in a systematic, and clearly collaborative, effort to wrongfully deprive Plaintiff of his legal and civil rights.

Defendant's alleged torts occurred in a connected, ongoing series of 50 to 100 wrongful acts, from January 2000 through the present, August 2006, and are likely to accumulate further as Defendant continues to make false statements, to omit vital facts, and to withhold essential evidence, as Defendant has done consistently for the past 6 ¾ years in order to conceal and deny their torts, and to wrongfully deny Plaintiff's legal and civil rights.

2

Plaintiff argues that this Honorable Court should apply the U.S. Supreme Court's rulings that the statute of limitations in civil rights cases is 4 years (42 U.S.C. s.1981 as amended by the Civil Rights Act of 1991, *Jones v. R.R. Donnelley & Sons Company* [May 3, 2004]), and that states can, indeed, be sued in federal court. Plaintiff also argues that because of the continuous and connected nature of Defendant's torts, the Defendant's latest torts, that clearly fall within the statute of limitations, should pull all of Defendant's alleged torts into the jurisdiction and judicial review of this Court.

Plaintiff also argues that the statute of limitations should be interpreted in light of two additional factors: the ongoing development of health damages and life losses, and our society's strictures against filing "frivolous" lawsuits. Plaintiff purposely did not file his federal lawsuit based on the first acts by Defendant that violated Plaintiff's legal and civil rights. Plaintiff first exhausted every known alternative before turning to this Honorable Court as a last resort. Also, Plaintiff did not file the current action at the time that the Defendant first violated plaintiff's legal and civil rights because there were no "recoverable damages" to warrant all the time, efforts, and costs of a lawsuit. In other words, Plaintiff responsibly avoided filing a premature and "frivolous" lawsuit by not filing the current lawsuit until truly severe, permanent, and recoverable damages developed as a result of Defendant's many, prolonged torts against Plaintiff.

Plaintiff's first knowledge that Defendant's torts had caused serious, permanent damage to Plaintiff's health was in November or December 2002. However, the "tentative" diagnoses (Sjogren's Syndrome or Fibromyalgia) were considered "equivocal" by Plaintiff's doctors, and the symptoms were still relatively few and mild. However, due to both chronic and acute stresses that Defendant caused Plaintiff to suffer as a direct result of Defendant's continuing torts, Plaintiff's first knowledge of truly severe, pervasive, and permanent damage to his health did not occur until

3

December 2003, shortly after the stress and distress of Plaintiff's state court appeal in September

2003 (during which Defendant lied to the judge, concealed evidence, and withheld evidence).

As a result of Defendant's torts, Plaintiff fell so severely ill in December 2003 that he was

bed-ridden for an entire month, and had to live with his parents for two months.  Plaintiff was in

such intense, constant pain that he felt that he was going to die, and at times wanted to die.

Plaintiff's health was in such a serious crisis that from December 2003 through November 2004

Plaintiff was forced to go to approximately 150 medical appointments (an average of 3 doctor

visits per week for 50 weeks).  In other words, as a direct result of the Defendant's ongoing torts,

the Plaintiff was made so ill, and made so busy seeking medical care, that Plaintiff was totally

unable to file any lawsuit or do any legal or governmental casework for an entire year, until

November and December 2004, when Plaintiff filed the current lawsuit.

Therefore, Plaintiff argues that the statute of limitations was tolled or extended by Plaintiff

being made severely ill and totally debilitated as a result of Defendant's ongoing torts against

Plaintiff.  Not to toll or extend the statute of limitations under these circumstances would be unfair

and unreasonable, and would reward and encourage Defendants to incapacitate Plaintiffs to

prevent them from filing lawsuits within the statute of limitations.  The statute of limitations for

healthy, fully functioning Plaintiffs should not be applied without tolling or extension to Plaintiffs

that are made severely ill and totally debilitated by the Defendants.

Plaintiff further alleges that Defendant intentionally, maliciously, and wrongfully

inflicted physical, mental, and emotional duress upon Plaintiff by violating Plaintiff's legal and

civil rights, so repeatedly, so consistently, and for such a long duration, that Plaintiff's original

temporary disability was catastrophically exacerbated into permanent and total disability.

Plaintiff's disability symptoms numbered 18 in 2000 (when Defendant began abusing Plaintiff

and his legal rights) but number 156 now in 2006, including degenerative diseases like auto-immune eye and ear diseases, diabetes, and arthritis-like pain impairing Plaintiff's entire body.

Plaintiff's numerous disabilities and diseases were caused by Defendant, and are medically proven to interact, and thereby severely increase the risk of further diseases to every organ, bone, and tissue of Plaintiff's body during the rest of his life. As a result, Defendant's torts have not only caused Plaintiff illness and disability, pain and suffering, and pervasive life-losses for life, but likely will shorten Plaintiff's natural lifespan.

As a result of Defendant's alleged torts against Plaintiff, Plaintiff has suffered severe and extensive damages to his health, to every aspect of his life, and to his previous comfort and enjoyment of life -- including being wrongfully given a "life imprisonment" in abject poverty. Plaintiff receives a total of $856 per month from the U.S., which is near the U.S. poverty level, while Plaintiff lives in San Jose, California, one of the most expensive housing markets and cost-of-living regions in America. $856 does not even pay rent for the average one-bedroom apartment in San Jose (which is about $1,200/month). As a result, Defendant's torts have wrongfully forced Plaintiff to borrow money from his retired parents every month for the last 6 ¾ years. Thus, Defendant's torts have wrongfully inflicted ongoing, monthly financial losses and mental duress upon Plaintiff's elderly parents, and emotional strains in Plaintiff's relations with his parents and brothers, which would not have existed but for the torts and losses inflicted by Defendant.

Defendant's alleged torts have made Plaintiff totally dependent upon Social Security, Medicare, and Medicaid for his sole income and medical treatments, in an era when all three of these government programs are in financial crises and are under continual political and economic pressures to reduce benefits to the disabled, the poor, and the aging – the disadvantaged groups into which Defendant's torts wrongfully forced Plaintiff for the rest of his life. If Defendant does

not financially compensate Plaintiff for violating his legal rights, for destroying his health and life, and for rendering him impoverished and totally dependent upon the federal government, Plaintiff will be wrongfully condemned to living in poverty, suffering increasing and worsening diseases, and struggling to survive on benefits that keep being reduced and keep falling below the cost of living.

In sum, several DLIR employees have behaved, and are still behaving, not as law-abiding state officials impartially acting in accord with federal, state, and agency laws, rules, and policies, but rather as self-protective, conflict-of-interest ridden outlaws who intentionally, systematically, and collaboratively abused the power and authority of their governmental positions, and willfully ignored the facts, the laws, and the legal and civil rights of the Plaintiff dozens of times over a prolonged period of 6 ¾ years. Defendant's many torts have, as a direct result, wrongfully inflicted severe and chronic physical, mental, and emotional duress upon Plaintiff that catastrophically aggravated his medical disabilities (that Defendant had complete records and knowledge of at the time of the torts). As a result, Defendant has wrongfully, totally, and permanently destroyed Plaintiff's health; stolen and diminished Plaintiff's life; and doomed Plaintiff to constant pain and suffering, constant stress and distress, worsening diseases, and worsening poverty – all of which, interacting and spreading, will likely shorten Plaintiff's life.


II.    Defendant's Torts – Main Examples and Time-Line

In an intentional pattern of wrongful acts, Defendant committed at least 50 to 100 torts, between January 2000 and August 2006, that violated Plaintiff's legal and civil rights, and concomitantly caused Plaintiff permanent health damages and life losses. The following are the

main examples and time-line of Defendant's torts.  Plaintiff respectfully reserves the right to allege and prove the rest of the Defendant's torts (that aren't listed here) at the time of trial.

1) On 12-12-00, Joyce Pang, Supervisor of DLIR's Employment Security Appeals Referees Office ("ESARO"), willfully and recklessly disregarded a letter to her, dated 12-6-00, from Plaintiff's doctor confirming Plaintiff's temporary total disability and requesting her to postpone Plaintiff's appeal hearings until Plaintiff was medically able to participate without damage to his health.

2) On 12-14-00, Thomas Rack, ESARO Hearing Officer, also ignored the 12-6-00 letter from Plaintiff's doctor (and ignores numerous pages of Plaintiff's medical records and governmental documents that confirm Plaintiff's total disability status).  Mr. Rack shows his prejudice and bias by asserting his opinion that Plaintiff only requests postponements for reasons (that Mr. Rack fails to specify or prove) that are not based on Plaintiff's medical needs.  Mr.Rack also agrees (by his silence) with employer's attorney who asserts that Plaintiff's total disability status from other federal and state agencies should not prevent Plaintiff from proceeding with ESARO hearings now. After two weeks of ESARO refusals of Plaintiff's requests and pleas for postponement of Plaintiff's appeal hearings, and the Hearing Officer's clear prejudice at the 12-14-00 hearing, Plaintiff feels forced to proceed, or claim will be denied, and plaintiff will have no legal standing to appeal the denial.

3) In mid-December 2000 and early January 2001, Ms. Pang "knowingly misstated, misrepresented, and omitted material facts" at least 18 times to Plaintiff's four U.S. Congresspersons and Senators. Ms. Pang's 18 torts violated federal laws such as U.S.C. 1001 and similar U.S. laws prohibiting "fraud" and "false statements" to federal officials, and state laws such as H.R.S. s. 383-92 and H.R.S. s. 383-30(5) and s.710-1060 to 1063, which prohibit giving "false testimony" and "misleading information" and H.A.R. s. 12-5-67 that prohibits "false statement, or misrepresentation, or nondisclosure of a material fact." Two of the 18 torts was that Ms. Pang intentionally omitted telling these 4 federal officials the material fact that I was legally and medically totally disabled, and that my doctor had asked Ms. Pang, personally and in writing just a few weeks before, to postpone my hearings for medical reasons, but that she had refused to do so. Ms. Pang and Mr. Rack had no legal basis to refuse my medical need for more time, yet they intentionally disregarded many laws, rules, and policies that guaranteed my legal and civil right for a postponement of my hearings.

4) On or about 12-28-00, DLIR's own legal expert on civil and legal rights, Tom Jackson (the Equal Opportunity officer and close aide to the DLIR Director) informed Ms. Pang that under the Americans with Disabilities Act ("ADA"), and other federal and state laws, that Plaintiff had a legal right for a postponement "for as long as he medically requires." According to Mr. Jackson, Ms. Pang became angry and argued about the requirements of the law. Ms. Pang did not follow the legal advice of DLIR's own legal expert, nor did she follow the requirements of the law. Instead, she only

granted Plaintiff a two-week delay in which Plaintiff was forced to keep exerting

himself (injuriously) to keep up with Mr. Rack's demanding hearing schedule.


5) In February 2001, the employer failed to give numerous subpoenaed documents and

evidence to the Plaintiff. Hearing Officer Rack failed to uphold the law and failed to

protect Plaintiff's basic legal right to evidence. Mr. Rack made no inquiry or

investigation of the employer, and made no effort to obtain a single subpoenaed

document from the employer.


6) On or about 2-27-01, Mr. Rack again denied Plaintiff's request for just 3 days more

time to exchange exhibits with employer, due to Plaintiff's medical condition

worsening from the unrelenting stresses of Mr. Rack's demanding schedule. Mr. Rack

shows his reckless disregard for Plaintiff's health by denying even 3 days time, but

also shows his contempt for Plaintiff by failing to either have an ESARO aide call

Plaintiff with an urgent answer, or faxing an answer to Plaintiff. Instead, Mr. Rack

scrawled "Request Denied" on Plaintiff's typed request – and carelessly left the

confidential document on the ESARO counter for Plaintiff to (presumably) find when

Plaintiff came to ESARO office to give a copy of his exhibits to Mr. Rack, on time.

Finally, employer failed to give Plaintiff their exhibits by the deadline that Mr. Rack

forced Plaintiff to meet (with extreme stress and injury). Mr. Rack thereupon excused

employer's failure by falsely claiming that Mr. Rack "would have" given Plaintiff the

same leeway that Mr. Rack had, in fact, just denied Plaintiff! Mr. Rack was repeatedly

blatantly self-contradictory, and when it mattered most, treated the employer

"disparately" and preferentially over the Plaintiff. For example, from December 2000 to March 2001, Mr. Rack <u>denied all</u> but one of Plaintiff's requests for time (and only when Ms. Pang over-ruled Mr. Rack's 12-28-00 denial and told him to give Plaintiff two weeks). But during this same period, Mr. Rack <u>granted all</u> three of the employer's requests for more time, totaling six weeks (!), including interrupting the middle of the hearings.

7) On 2-28-01, Mr. Rack completed his "in camera" review of Plaintiff's 200 pages of medical records. Note that Mr. Rack thereby knew in detail that Plaintiff was, in fact, totally disabled, and that Plaintiff's health was in dire jeopardy from the stresses of preparing for, and participating in, the hearings. Mr. Rack's knowledge of Plaintiff's severe health problems that were always worsened by stress makes Mr. Rack's refusal to grant Plaintiff even 3 days on 2-27-01 not only sadistic, but constitutes "reckless endangerment." (In fact, from the beginning to the present, ESARO and DLIR officials have repeatedly and wrongfully endangered and damaged Plaintiff's health – to tragic and catastrophic extents.) Based on Mr. Rack's detailed knowledge of Plaintiff's medical records – and the dire risks to Plaintiff's health – Mr. Rack had a legal duty to postpone the hearings that Plaintiff and Plaintiff's doctor had repeatedly asked be postponed. But, as always, Mr. Rack intentionally disregarded Plaintiff's medical records and legal and civil rights – and intentionally inflicted repeated and wrongful physical, mental, and emotional duress upon the Plaintiff by making the hearings proceed no matter what. Mr. Rack and Ms. Pang never bothered to give

Plaintiff a reasonable explanation of <u>why</u> they were so insistent that the hearings must proceed despite Plaintiff's severe medical condition.

8) On or about March 14, 2001, Mr. Rack violated state law, administrative rule, and agency policy by talking with the employer behind the Plaintiff's back, off the recorded record, when Plaintiff was asked by Mr. Rack to step out of the room. Mr. Rack instructed Plaintiff to call his next witness from a phone outside the hearing room. Plaintiff got the witness on the phone, came back into the hearing room, and immediately Mr. Rack told Plaintiff that he would not permit the witness to testify! Apparently the employer had objected against the witness – at the last minute, when the Plaintiff was not present, and Mr. Rack had discussed things with the employer behind Plaintiff's back and off-the-record, and disallowed the witness from testifying, without giving the Plaintiff a fair or adequate chance to argue for the witness's testimony. The witness had been approved by Mr. Rack and the employer just a month or so before, and Mr. Rack had personally subpoenaed the witness to testify. Once again, Mr. Rack's blatant self-contradictory misconduct prejudiced and harmed the Plaintiff and violated Plaintiff's legal rights for due process and a fair and full hearing.

9) On or about March 15, 2001, Mr. Rack revealed his hostility and bias against Plaintiff by loudly and angrily yelling at Plaintiff without good cause, and persistently attempting to prevent Plaintiff from exercising Plaintiff's fundamental constitutional right to cross-examine an employee-witness for the employer who had falsely accused Plaintiff. Plaintiff succeeded in proving the witness had falsely accused Plaintiff in the

witness's sworn testimony. Nevertheless, Mr. Rack – as always – failed to question the witness, and failed to penalize the witness or the employer for a clear, repeated pattern of making false accusations against the Plaintiff that were disproved in the hearings, and also shortly after the hearings.

10) On May 2, 2001, Mr. Rack violated Plaintiff's fundamental legal right to review the ESARO record to prepare for the presentation of evidence at the Plaintiff's final hearings on May 7-9, 2001. Mr. Rack not only violated his own promise to Plaintiff that Mr. Rack had written in an official letter dated December 28, 2000 that "either party is free to review the file at any time," but Mr. Rack also violated the central Hawaii Revised Statute that guarantees an appellant the legal right to review the ESARO file at any time to prepare for the presentation of evidence at the appellant's ESARO hearings. Mr. Rack knew of this state statute because he mockingly cited it to Plaintiff one month later as the reason that he would not allow Plaintiff to access Plaintiff's ESARO records, saying that after the hearings the right to access expired. (Mr. Rack's denial of access was later found to be illegal. Please see below.)

11) On or about May 29 and June 5, 2001, Ms. Pang violated state law, administrative rule, and DLIR policy by failing to investigate Plaintiff's written complaint about Mr. Rack's May 2, 2001 violation of Plaintiff's basic legal right to review the ESARO file to prepare for Plaintiff's final ESARO hearings. Ms. Pang intentionally failed to question both Mr. Rack and ESARO aide Yvonne Katayama, who was a firsthand

witness to Mr. Rack's tort. Ms. Pang also violated her legal duty by failing to even reply to Plaintiff about this very serious complaint and violation.

12) Throughout July 2001, both Mr. Rack and Ms. Pang violated their legal duties by willfully refusing to consider Plaintiff's extensive evidence that employer's employee-witnesses had repeatedly lied under oath during Plaintiff's appeal hearing, in a coordinated and probably conspired effort to deny Plaintiff's legal rights to unemployment benefits. By refusing to even consider extensive evidence of widespread perjury by employer's four main witnesses, Mr. Rack's 7-25-01 decision denying Plaintiff benefits, was intentionally based on employer lies and omissions, and willfully denied Plaintiff a fair and full hearing.

13) On July 25, 2001, Mr. Rack issued his decision denying my appeal for unemployment benefits. As just stated, his decision was knowingly based on the employer's employee-witnesses' sworn oral perjury and written fraud. Mr. Rack's 7-25-01 decision also was fundamentally flawed by numerous intentional acts of error of fact, errors of law, omissions of material facts, and malicious statements of things he knew were untrue (that hurt my case), and not saying things that he knew were true (that would have made my case win). Plaintiff respectfully reserves the right to provide a full account at time of trial, but for now Plaintiff will give one major example. On pages 17-18 of Mr. Rack's 18-page decision, he falsely concludes that Plaintiff did not have "good cause" to quit his job, and thus was ineligible for unemployment benefits. Mr. Rack's conclusion is demonstrably false, an error of fact and of law, omits

material facts, and reveals his extreme malice and hostility toward the legal and civil

rights of the Plaintiff. As stated above, Mr. Rack had read over 200 pages of

Plaintiff's medical records. Mr. Rack knew that Plaintiff was totally disabled on the

job by the working conditions and the bosses' abuse of the Plaintiff. Mr. Rack knew

that 6 independent doctors, the State of Hawaii Department of Human Services, and

the U.S. Social Security Administration <u>all agreed</u> that Plaintiff was totally disabled as

of October 14, 1999, his very last day on the job. Mr. Rack knew that Plaintiff never

worked since that last day on the job, and likely never would work again (which is now

confirmed). Mr. Rack knew that Plaintiff had been made chronically ill during the job

and by the job, and was acutely ill at the time Plaintiff was forced to quit his job

involuntarily, for health reasons. Mr. Rack also knew that Plaintiff was acutely ill for

an entire month after he quit his job. And Mr. Rack knew that Plaintiff was severely

ill, both physically and emotionally, an entire year later, in September 2000, just 90

days before Mr. Rack started forcing Plaintiff through the extremely stressful appeal

process. (The official ESARO records even hold evidence that Mr. Rack withheld

Plaintiff's medical records by Dr. Stanley Luke that proved that Plaintiff was too ill

and disabled to prepare for, or participate in, the 6-montht long hearings without

damaging his health.) But Mr. Rack intentionally and maliciously <u>omitted all</u> of these

centrally material facts from his "decisions." (Mr. Rack did not admit a single one of

these vital facts in his decision. Why? Because individually and collectively these

facts actually <u>prove</u> what Mr. Rack refused to admit: <u>that the Plaintiff was forced to</u>

<u>quit his job involuntarily for health reasons</u> – and therefore was legally eligible to

<u>receive unemployment benefits</u>. Hawaii Administrative Rules s. 12-5-47 states that

"Good cause for leaving employment may be found where there is: (1) <u>Change in</u> <u>working conditions and the change is prejudicial or detrimental to the health, safety, or</u> <u>morals of the claimant</u>; (2) Change in terms and conditions of employment, including, but not limited to: change in rate of pay, position or grade, duties, days of work, or hours of work;" (etc.)  Plaintiff proved in the ESARO hearings that he met these two criteria.  (Only one criterion is required to be eligible for unemployment benefits.)  But criterion number one, involving "changes in work conditions that are detrimental to the health and safety of the claimant" -- the Plaintiff met this criterion overwhelmingly and irrefutably.  Plaintiff's health was legally and medically "totally disabled" as of his last day on the job, on October 14, 1999.  And Mr. Rack's and Ms. Pang's and DLIR's hostile, prejudiced, malicious, systematic, and collaborative torts forced Plaintiff through so many stresses of such severity for so long that Plaintiff's "total disability" is now catastrophic and permanent.

14) From May 2, 2001 through May 2002, Mr. Rack and Ms. Pang violated state law, administrative rule, and DLIR policy by denying Plaintiff's written requests to access and copy parts of Plaintiff's own ESARO records (initially the tapes and later the entire record) for the legitimate purposes of : A) filing a crime report of perjury and fraud by the employer's witnesses; B) presenting evidence in Small Claims Court for wages wrongfully withheld by employer from Plaintiff; and C) preparing Plaintiff's case and opening brief in a state court appeal of Mr. Rack's wrongful denial of benefits.  Mr. Rack and Ms. Pang had blatant conflicts-of-interest, because they legally and ethically should not withhold evidence that would defeat their own decision and

impugn their own conduct. But, as always, Mr. Rack and Ms. Pang failed to recuse

themselves and let an impartial DLIR official decide Plaintiff's request to access and

copy Plaintiff's own ESARO records. Mr. Rack's and Ms. Pang's 13 denials of

plaintiff's requests to access records not only violated H.R.S. law (each violation

warrants a $1,000 fine), but also caused Plaintiff extreme stress and injury to his health

as Plaintiff struggled in vain to get several state officials and agencies to uphold state

law and gain access for Plaintiff to his own records, in accord with H.R.S. 92, 92F, and

383-?.

15) In November 2001, Mr. Rack violated a subpoena by refusing again to give copies of

the Plaintiff's ESARO hearings to Plaintiff for evidence in the above-mentioned Small

Claims Court unpaid wages case. Mr. Rack went so far as to go to the court, grossly

misrepresented Plaintiff's actions and intentions regarding the ESARO tapes, and then

waited for an opportunistic moment (when the Plaintiff was talking with employer's

attorney and could not hear Mr. Rack talking to the judge) whereupon Mr. Rack

sneakily asked the judge to quash the subpoena. The judge granted Mr. Rack's

request, and Plaintiff being caught off guard, he acquiesced to the judge's decision.

Mr. Rack thereupon misrepresented the facts in gloating a letter to the Office of

Information Practices ('OIP") and the DLIR in an internal memo. This incident further

reveals Mr. Rack's pattern of suppressing and withholding of evidence, violating

Plaintiff's legal rights, shamelessly deploying deceitful tactics to get what he wants,

and lying to courts and other government officials.

16) In January 2002, Mr. Rack lied to the state circuit court in a written statement that the ESARO records sent to the court were accurate and complete, when they were not. Despite the "Designation of Record on Appeal" and the court's "Order for Certification and transmission of Record," Mr. Rack and Ms. Pang intentionally withheld from the court all of the audio tapes, which were specifically ordered to be sent to the court in item # 22 of the aforementioned "Designation of Record on Appeal." In addition, Mr. Rack intentionally concealed the important document cited above (his letter to me dated December 28, 2000 promising me access "to review the file at any time"). This key evidence should have been listed individually in the ESARO Table of Contents – but it intentionally was not listed at all. It took the Plaintiff several months to discover by chance that this document was hidden among a group of documents in the ESARO record. Mr. Rack had also previously written a note to ESARO aides to withhold evidence from the ESARO records and the Plaintiff in the ESAR hearings. This tortious pattern of withholding and denying the existence of essential evidence is being repeated by DLIR currently. (Please see below.)

17) In March or April 2002, DLIR's Deputy Attorney General, Frances Lum, and Ms. Pang got into a month-long bitter legal-argument over whether Plaintiff had a legal right to a copy of Plaintiff's ESARO records. Pang lost the legal argument, and thus, had committed torts 13 times and for an entire year by denying all of my written requests to access and copy my ESARO records.

18) In March or April 2002, after Ms. Pang lost the legal argument, she nervously asked

DLIR's legal expert, Tom Jackson (whose legal advice on this very issue Ms. Pang

angrily disregard in December 2000) whether she had violated Plaintiff's legal and

civil rights.  DLIR's Deputy Attorney General, Frances Lum, violated DLIR policy

and standard procedures (and probably state laws) by intervening and instructing Mr.

Jackson not to give Ms. Pang his legal answer to her question in writing – but only

orally.  Ms. Lum thus violated Plaintiff's legal and civil rights herself by preventing a

"smoking gun" document and evidence.  Because Mr. Jackson carefully reviewed the

law and informed Ms. Pang that, in fact, Ms. Pang and Mr. Rack had violated

Plaintiff's legal and civil rights at least 13 times for the entire year of May 2001

through May 2002.  Obviously, <u>Plaintiff's current allegations would have been</u>

<u>confirmed by DLIR's own legal expert if Deputy Attorney General Lum had not</u>

<u>prevented Mr. Jackson from writing a document stating DLIR violated Plaintiff's legal</u>

<u>and civil rights</u>!  This is yet another example that the DLIR is not respecting and acting

in accordance with the law – but that many DLIR collaborate to commit torts and

violate the legal and civil rights of state citizens –even Deputy Attorneys General!


19) In March or April 2002, after Ms. Pang lost the legal argument, she was instructed by

the DLIR Director to give the Plaintiff a complete record of Plaintiff's ESARO

records, Ms. Pang intentionally did not make it a priority and delayed at least a month

in fully completing the DLIR Director's orders.  Ms. Pang had to be told a second

time, emphatically, to do it right away.  Plaintiff did not get all his records until about

May 20, 2002 (after an entire year and about 15 requests).

20) On October 7, 2002, both Ms. Pang and Mr. Rack submitted written statements to

federal investigators at the U.S. Department of Labor's Civil Rights Center ("CRC")

who were investigating my civil rights complaint. In response to CRC interrogatory

question #19, Ms. Pang submitted a one-page statement to CRC, and Mr. Rack

submitted a 5 ½ page statement to CRC. I have just received this evidence in the last

few days, as a result of my own Freedom of Information Act request to DLIR on July

13, 2006. As a result of my recent receipt and my disabled condition, I have not yet

been able to analyze these documents in detail. However, an initial, cursory

"skimming" of both documents makes it appear that both Ms. Pang and Mr. Rack have

"knowingly made misstatements, misrepresentations, and omissions of material facts"

to federal officials for the purpose of "misleading" and "defrauding" these officials,

and to deny and escape legal liability for Ms. Pang's and Mr. Rack's violating my legal

and civil rights, and financial liability for damaging my health and life catastrophically

and permanently. First, Ms. Pang and Mr. Rack have a long and provable record of

lying to 4 U.S. Congresspersons and Senators, a state small court judge, the OIP, the

DLIR itself, a state circuit court judge, and CRC federal investigators. (With this

lengthy pattern and *modus operandi*, I respectfully request this federal court to be alert

for DLIR's "misstatements, misrepresentations, and omissions of fact," and DLIR's

withholding and concealing of evidence, as this case proceeds.) Second, both Ms.

Pang and Mr. Rack intentionally "omitted the material fact" to CRC that DLIR's own

legal expert, Mr. Jackson had given Ms. Pang his considered legal opinion that "Ms.

Pang and Mr. Rack had violated Plaintiff's legal and civil rights 13 times for an entire

year," (at the very least and possibly more). Mr. Jackson had informed Ms. Pang of this legal determination in around May 2002, that is, only 4 or 5 months before their statements to CRC. It is likely that Ms. Pang then told Mr. Rack, her close subordinate and collaborator in violating my legal rights numerous times over the previous 1 ¾ years. Thus, both Ms. Pang and Mr. Rack added lying to federal investigators at CRC to their many violations of U.S.C. 1001 and the many other similar federal and state laws listed in # 3 of this list. Their only intent seems to be to avoid legal liability at all costs. At trial, Plaintiff will provide a full list of the many "knowing misstatements, misrepresentations, and omissions of material fact" that Ms. Pang and Mr. Rack committed tortiously in their statements to federal investigators at CRC on October 7, 2002.

21) In September 2003, Ms. Pang also lied to the state judge that she did not know the audio tapes needed to be sent to the court. Ms. Pang lied to the court because not only were the tapes clearly ordered to be sent to the court in item #22 of the Designation of Record on Appeal" that was served on ESARO (of which Ms. Pang is Supervisor), but in addition, Plaintiff emphatically and repeatedly reminded ESARO of the court order for all of the audio tapes of Plaintiff's ESARO hearings in a letter to Mr. Rack in August or September 2001, and in two or three Motions that Plaintiff sent copies of to ESARO. It is inconceivable that Ms. Pang (and Mr. Rack) "did not know" they were court-ordered to send the tapes to the court. Ms. Pang finally sent the tapes to the court – two years late, and at 4:15 P.M. the Friday before the court hearing the next Monday

at 8:15 A.M., thus making it impossible for the judge to listen to any part of the tapes

(like Mr. Rack's ugly yelling at Plaintiff on March 15, 2001).

22) In or around March 2005, Mr. Rack wrote to CRC to inquire about the progress and

outcome of CRC's investigation of my civil rights complaint against ESARO and

DLIR. By contacting CRC on this case, Mr. Rack "re-opened the door" for statute of

limitations purposes on his torts against Plaintiff. Mr. Rack had a legal duty to inform

CRC, albeit belatedly by 2½ years, that DLIR's Mr. Jackson had told Ms. Pang that

she and Mr. Rack had, in fact, violated Plaintiff's legal and civil rights at least 13 times

for an entire year. But once again, Mr. Rack knowingly omitted this fact that was, and

still is, very material to CRC's investigation of Mr. Rack, Ms. Pang, and DLIR. Again

in March 2005, Mr. Rack violated U.S.C. 1001 and many similar federal and state laws

that make it a felony and a fineable offence to knowingly withhold material facts.

Again, Mr. Rack is a government official who not only violated the law in Plaintiff's

hearings that he controlled, but is a public official who routinely lies to other officials!

23) On August 17, 2006, DLIR finally responded to Plaintiff's FOIA request of July 13,

2006. Once again in the long DLIR pattern, DLIR not only withheld most of the

documents that Plaintiff requested under federal and state laws, but DLIR also coyly

claims that "we do not have and do not know whether some of the documents you

requested ever existed." Note that DLIR fails to inform Plaintiff specifically which

documents do not still exist; whether they were stolen, destroyed or lost; what

documents do exist but DLIR is withholding from me; what legal basis, if any,

exempts the release of which documents; and other specific facts Plaintiff requires in order to continue his pursuit of essential evidence in the current lawsuit. To add insult to injury, DLIR sent Plaintiff a bill for $148.05 – even though Plaintiff has been granted "pauper" status by this federal court, and formally requested DLIR to waive all fees because Plaintiff is using the documents for personal use and eventually in the public interest ( to learn how government works and the need for reform). Plaintiff will be requesting this court to subpoena the documents that DLIR is refusing to release, and even refusing to identify. For example, in #__above, Ms. Lum and Ms. Pang each wrote long legal memorandum to the DLIR Director arguing their differing positions on my request to access and copy my ESARO records. I have requested copies of these two memos, in part to show Ms. Pang's failure to maintain her legally-required "total impartiality" toward my case and my legal rights – and also to show Ms. Pang's way of thinking about individual rights and her way of interpreting the law, and how her way differs on these points with Deputy Attorney Lum's. Since Ms. Pang was legally wrong in her thinking and actions toward me, it may prove "material" to my allegations that she and Mr. Rack violated my legal and civil rights. I think my legal rights and needs in the current lawsuit far outweigh DLIR's right to keep secret "internal memos" -- especially when DLIR is accused of committing systematic torts against the Plaintiff, with catastrophic results.

24) In conclusion, even this partial list shows that DLIR intentionally violated Plaintiff's legal and civil rights numerous times from at least December 2000 through the present, August 2006 (and ongoingly, as DLIR withholds and denies the existence of essential

evidence in this lawsuit). Clearly, the statute of limitations has not expired, and all of the provable facts are necessary to show this fundamental fact: many DLIR officials have committed torts against the Plaintiff in a systematic, collaborative, institutionalized manner that the courts must end, because DLIR benefits from its tortious, secretive status quo.

III.    Plaintiff's Damages and Losses – and Financial Compensation Sought

In the interests of both time and space, Plaintiff will not list every damage and loss that Defendant has wrongfully caused Plaintiff. The purpose of the following list is to give this Honorable Court, and the Defendants, a fair idea of Plaintiff's damages and losses in this complaint. Again, Plaintiff respectfully reserves the right to elaborate the details and to complete this list at the time of trial.

1) Financial compensation for each and every one of Defendant's torts against Plaintiff, and for the wrongful deprivation of the Plaintiff's legal and civil rights, and all of the hardships and harm to Plaintiff that directly and indirectly resulted, and will result, from the effects of Defendant's torts against Plaintiff.

2) Plaintiff respectfully requests this Court to consider the exhibit previously submitted to this court entitled, "James A. Barch's 156 Disability and Disease Symptoms (as of June 15, 2006)" to be listed here in its entirety.

3) Plaintiff's loss of "enjoyment of life."

4) Loss of Plaintiff's previous, 30 years of very high level of daily athletic recreation, fun, happiness, health, and fitness.

5) Loss of Plaintiff's enjoyment (and even interest in) many other non-sport recreational and cultural activities.

6) Plaintiff being forced to change from being out-of-doors and highly social for 44 years, to being shut-in and alone and lonely for the past 7 years.

7) Loss of Plaintiff's 4 closest friends, some best friends of 22 and 14 years' duration, plus a former girlfriend.

8) Numerous painful conflicts and strains in Plaintiff's previously harmonious and close relations with his parents and brothers.

9) Loss of all of Plaintiff's professional colleagues.

10) Loss of all of Plaintiff's engagement with his local community

11) Loss of all of Plaintiff's faith and trust in people generally.

12) Loss of all of Plaintiff's faith and trust in government and people in power.

13) Loss of Plaintiff's entire social life (except for family and doctors).

14) Loss of Plaintiff's romantic life for 7 years.

15) Severe and permanent reduction in Plaintiff's ability to enter into, and maintain, happy romantic relations, including especially, Plaintiff's desire to be married.

16) Severe and permanent reduction in Plaintiff's ability to enter into, and maintain, happy friendships.

17) Plaintiff's permanent loss of professional, collegial relationships.

18) Plaintiff's permanent loss of his chosen profession, to be a psychotherapist, for which he spent 26 years educating and training himself to became an excellent psychotherapist, with much knowledge and skills that helped other people, and gave Plaintiff profound satisfaction and self-respect. Loss of latter satisfaction helping others and of self-esteem. In their place, Defendant wrongly caused Plaintiff to become permanently unable to work any job at all, to feel ill and function poorly all the time, and to be a burden on his family and his society.

19) Wasted days and a wasted life. Because Plaintiff is so ill and disabled all of the time, 95% of Plaintiff's days are spent suffering and struggling. It is very difficult,

painful, and exhausting to be either productive or playful. Plaintiff's existence is miserable and monotonously empty, where before it was full and satisfying.

20) Loss of Plaintiff's previous and desired personality. For 44 years, Plaintiff was, overall, extremely healthy, happy, energetic, enthusiastic, and actively engaged in numerous professional, educational, social, and recreational activities. Due to Defendant's abusive and traumatic damages and losses caused to Plaintiff, Plaintiff is not his old self. He is chronically ill, totally disabled, profoundly miserable, and because of Post-Traumatic Stress Disorder, chronically prone to angry outbursts when he feels mistreated. Before, Plaintiff had high tolerance for stress – which is what led to his health being destroyed: if Plaintiff had not had the strength and endurance to work a terrible job for an entire year or to fight a terrible state government for 6 ¾ years (and counting), but had been a "quitter," ironically, Plaintiff would still have his previous good health.

21) Loss of wages and income. Plaintiff has a Master's Degree in Clinical Psychology, and was a top student and top professional among his stage-equivalent peers. Starting at $35,000 annual full-time income and eventually reaching $70,000 annual income seems to have been a reasonable lifetime expectation. Thus, an average of $50,000 per year for 20 to 25 years of lost working years (Plaintiff was disabled at age 44 and probably would have worked until age 64 or 69, nowadays), means that Plaintiff's lost lifetime earnings would have been $1,000,000 to $1,250,000.

22) Instead, Defendant has wrongfully caused Plaintiff to be restricted to a mere $800 to $856 per month for the last 7 years – and a comparable pittance for the next 30 or 40years of Plaintiff's life.  Furthermore, Defendant has wrongfully made Plaintiff totally dependant on Social Security for income and Medicarer and Medicaid in an era when all 3 programs are in financial crises, which will only get worse during Plaintiff's life, due to the retirement of the Baby Boom generation, and the catastrophic deficit created by the current Administration and Congress.  If plaintiff is denied fair and full financial compensation from Defendant, Plaintiff will wrongly suffer not only 30 to 40 years of destroyed health, pain and suffering, a wasted life, but abject poverty as well – and the Defendant will have truly "gotten away with murder" of Plaintiff's health and life.

23) Plaintiff's 156 symptoms caused by Defendant include several dangerous and degenerative diseases, like autoimmune diseases of the eyes and ears, arthritis-like pain and loss of range of motion and mobility, diabetes, etc.  Many of Plaintiff's illnesses are medically proven to interact and eventually cause additional, severe illnesses, like heart disease, stroke, dementia, kidney and liver disease, and blindness.  Already Plaintiff has developed two retinal diseases and cataract formation.  Taken altogether, it is very likely that Defendant not only has caused Plaintiff 156 disease and disability symptoms, and all the resulting pain and suffering and loss of feeling and functioning and enjoyment of life –but that most

27

likely the Defendant has set in motion disease processes that also shorten the
duration of Plaintiff's life.

24) For all of the above damages and losses (and several more that Plaintiff will
specify at trial), and for all of the above torts by the Defendant, and especially
because of the intentional and malicious, systematic and collaborative, and
repetitive and prolonged nature of the Defendant's tortious misconduct against the
Plaintiff, the Plaintiff is seeking punitive damages, as well as special and general
damages, totaling $5 million from the DLIR and the State government of Hawaii.
Partly this amount is meant, not only to financially compensate the Plaintiff for all
of his many catastrophic losses and sufferings, but also to strongly induce DLIR
and the State of Hawaii to completely reform its thoroughly corrupt and arrogant
institutionalized prejudice and hostility against its individual citizens, and its unjust
favoritism toward employers and business, from whom the government gets most
of its tax money and campaign contributions. The State of Hawaii in general, and
the DLIR in particular have terrible reputations of corruption and unfairness to the
individual seeking unemployment and workers compensation benefits. And just
like the Felix v. Wahihee lawsuit, it will take the intervention of the federal court to
force the DLIR and the State of Hawaii to reform itself, to follow the law, and to
respect the legal and civil and human rights of its most vulnerable citizens.

I declare under penalty of perjury that the foregoing is true and correct.

28

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against the Defendant, as follows:

1) For special, general, and punitive damages, in the mount of $5,000,000; and

2) For prejudgment interest at the legal rate, a reasonable attorney's fee, and taxable costs, and such other further relief as the Court deems just in the premises.

DATED:       Los Gatos, California, August 27, 2006

*James A Barch*

JAMES A. BARCH

Plaintiff Pro Se