# EXHIBIT "A"

JAMES A. BARCH

16101 Escobar Avenue

Los Gatos, CA 95032

(408) 978-5727

Plaintiff Pro Se


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


| | | |
|---|---|---|
| JAMES A. BARCH, | ) | CIVIL NO. 04-00712 SOM-BMK |
| Plaintiff, | ) | (Other Civil Action) |
| vs. | ) | |
| | ) | EXHIBIT "A": PLAINTIFF'S |
| STATE OF HAWAII DEPARTMENT OF LABOR | ) | CORRECTED AMENDED |
| & INDUSTRIAL RELATIONS; | ) | COMPLAINT; SUMMONS; |
| Defendants. | ) | CERTIFICATE OF SERVICE |


Hearing:

Date:  October 23, 2006

Time:  3:00 P.M. (Hawaii time)

Judge:  The Hon. Susan Oki Mollway

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JAMES A. BARCH, | ) | CIVIL NO. 04-00712 SOM-BMK |
| Plaintiff, | ) | (Other Civil Action) |
| vs. | ) | |
| | ) | PLAINTIFF'S CORRECTED |
| STATE OF HAWAII DEPARTMENT OF LABOR | ) | AMENDED COMPLAINT |
| & INDUSTRIAL RELATIONS; | ) | |
| Defendants. | ) | |

PLAINTIFF'S CORRECTED AMENDED COMPLAINT

I.    Introduction

Plaintiff Pro Se, James A. Barch, (hereafter "Plaintiff"), alleges that several government officials within, or under, the State of Hawaii's Department of Labor and Industrial Relations (hereafter "Defendant" or "DLIR") knowingly, intentionally, and maliciously violated numerous Federal laws, Hawaii Revised Statutes, Hawaii Administrative Rules, and DLIR policies in a systematic, and clearly collaborative, effort to wrongfully deprive Plaintiff of his legal and civil rights.

Defendant's alleged torts occurred in a connected, ongoing series of 50 to 100 wrongful acts, from January 2000 through the present, August 2006, and are likely to accumulate further as Defendant continues to make false statements, to omit vital facts, and to withhold essential evidence, as Defendant has done consistently for the past 6 ¾ years in order to conceal and deny their torts, and to wrongfully deny Plaintiff's legal and civil rights.

Plaintiff argues that this Honorable Court should apply the U.S. Supreme Court's rulings that the statute of limitations in civil rights cases is 4 years (42 U.S.C. s.1981 as amended by the Civil Rights Act of 1991, *Jones v. R.R. Donnelley & Sons Company* [May 3, 2004]), and that states can, indeed, be sued in federal court. Plaintiff also argues that because of the continuous and connected nature of Defendant's torts, the Defendant's latest torts, that clearly fall within the statute of limitations, should pull all of Defendant's alleged torts into the jurisdiction and judicial review of this Court.

Plaintiff also argues that the statute of limitations should be interpreted in light of two additional factors: the ongoing development of health damages and life losses, and our society's strictures against filing "frivolous" lawsuits. Plaintiff purposely did not file his federal lawsuit based on the first acts by Defendant that violated Plaintiff's legal and civil rights. Plaintiff first exhausted every known alternative before turning to this Honorable Court as a last resort. Also, Plaintiff did not file the current action at the time that the Defendant first violated plaintiff's legal and civil rights because there were no "recoverable damages" to warrant all the time, efforts, and costs of a lawsuit. In other words, Plaintiff responsibly avoided filing a premature and "frivolous" lawsuit by not filing the current lawsuit until truly severe, permanent, and recoverable damages developed as a result of Defendant's many, prolonged torts against Plaintiff.

Plaintiff's first knowledge that Defendant's torts had caused additional damage to Plaintiff's health was in November or December 2002. However, the "tentative" diagnoses (Sjogren's Syndrome or Fibromyalgia) were considered "equivocal" by Plaintiff's doctors, and the symptoms were still relatively few and mild. However, due to both chronic and acute stresses that Defendant caused Plaintiff to suffer as a direct result of Defendant's continuing torts, Plaintiff's first knowledge of truly severe, pervasive, and permanent damage to his health did not occur until

December 2003, shortly after the stress and distress of Plaintiff's state court appeal in September 2003 (during which Defendant lied to the judge, concealed evidence, and withheld evidence).

As a result of Defendant's torts, Plaintiff fell so severely ill in December 2003 that he was bed-ridden for an entire month, and had to live with his parents for two months. Plaintiff was in such intense, constant pain that he felt that he was going to die, and at times wanted to die. Plaintiff's health was in such a serious crisis that from December 2003 through November 2004 Plaintiff was forced to go to approximately 150 medical appointments (an average of 3 doctor visits per week for 50 weeks). In other words, as a direct result of the Defendant's ongoing torts, the Plaintiff was made so ill, and made so busy seeking medical care, that Plaintiff was totally unable to file any lawsuit or do any legal or governmental casework for an entire year, until November and December 2004, when Plaintiff filed the current lawsuit.

Therefore, Plaintiff argues that the statute of limitations was tolled or extended by Plaintiff being made severely ill and totally debilitated as a result of Defendant's ongoing torts against Plaintiff. Not to toll or extend the statute of limitations under these circumstances would be unfair and unreasonable, and would reward and encourage Defendants to incapacitate Plaintiffs to prevent them from filing lawsuits within the statute of limitations. The statute of limitations for healthy, fully functioning Plaintiffs should not be applied without tolling or extension to Plaintiffs that are made severely ill and totally debilitated by the Defendants.

Plaintiff further alleges that Defendant intentionally, maliciously, and wrongfully inflicted physical, mental, and emotional duress upon Plaintiff by violating Plaintiff's legal and civil rights, so repeatedly, so consistently, and for such a long duration, that Plaintiff's original temporary disability was catastrophically exacerbated into permanent and total disability. Plaintiff's disability symptoms numbered 18 in 2000 (when Defendant began abusing Plaintiff

and his legal rights) but number 156 now in 2006, including degenerative diseases like auto-immune eye and ear diseases, diabetes, and arthritis-like pain impairing Plaintiff's entire body.

Plaintiff's numerous disabilities and diseases were caused by Defendant, and are medically proven to interact, and thereby severely increase the risk of further diseases to every organ, bone, and tissue of Plaintiff's body during the rest of his life. As a result, Defendant's torts have not only caused Plaintiff illness and disability, pain and suffering, and pervasive life-losses for life, but likely will shorten Plaintiff's natural lifespan.

As a result of Defendant's alleged torts against Plaintiff, Plaintiff has suffered severe and extensive damages to his health, to every aspect of his life, and to his previous comfort and enjoyment of life -- including being wrongfully given a "life imprisonment" in abject poverty. Plaintiff receives a total of $856 per month from the U.S., which is near the U.S. poverty level, while Plaintiff lives in San Jose, California, one of the most expensive housing markets and cost-of-living regions in America. $856 does not even pay rent for the average one-bedroom apartment in San Jose (which is about $1,100/month). As a result, Defendant's torts have wrongfully forced Plaintiff to borrow money from his retired parents every month for the last 6 ¾ years. Thus, Defendant's torts have wrongfully inflicted ongoing, monthly financial losses and mental duress upon Plaintiff's elderly parents, and emotional strains in Plaintiff's relations with his parents and brothers, which would not have existed but for the torts and losses inflicted by Defendant.

Defendant's alleged torts have made Plaintiff totally dependent upon Social Security, Medicare, and Medicaid for his sole income and medical treatments, in an era when all three of these government programs are in financial crises and are under continual political and economic pressures to reduce benefits to the disabled, the poor, and the aging – the disadvantaged groups into which Defendant's torts wrongfully forced Plaintiff for the rest of his life. If Defendant does

not financially compensate Plaintiff for violating his legal rights, for destroying his health and life, and for rendering him impoverished and totally dependent upon the federal government, Plaintiff will be wrongfully condemned to living in poverty, suffering increasing and worsening diseases, and struggling to survive on benefits that keep being reduced and keep falling below the cost of living.

In sum, several DLIR employees have behaved, and are still behaving, not as law-abiding state officials impartially acting in accord with federal, state, and agency laws, rules, and policies, but rather as self-protective, conflict-of-interest ridden outlaws who intentionally, systematically, and collaboratively abused the power and authority of their governmental positions, and willfully ignored the facts, the laws, and the legal and civil rights of the Plaintiff 50 to 100 times over a prolonged period of 6 ¾ years. Defendant's many torts have, as a direct result, wrongfully inflicted severe and chronic physical, mental, and emotional duress upon Plaintiff that catastrophically aggravated his medical disabilities (that Defendant had complete records and knowledge of at the time of the torts). As a result, Defendant has wrongfully, totally, and permanently destroyed Plaintiff's health; stolen and diminished Plaintiff's life; and doomed Plaintiff to constant pain and suffering, constant stress and distress, worsening diseases, and worsening poverty – all of which, interacting and spreading, will likely shorten Plaintiff's life.


II.    Defendant's Torts – Main Examples and Time-Line

In an intentional pattern of wrongful acts, Defendant committed at least 50 to 100 torts, between January 2000 and August 2006 that violated Plaintiff's legal and civil rights, and concomitantly caused Plaintiff permanent health damages and life losses. The following are the

13

main examples and time-line of Defendant's torts.  Plaintiff respectfully reserves the right to allege and prove the rest of the Defendant's torts (that aren't listed here) at the time of trial.

1) On 12-12-00, Joyce Pang, Supervisor of DLIR's Employment Security Appeals Referees Office ("ESARO"), willfully and recklessly disregarded a letter to her, dated 12-6-00, from Plaintiff's doctor confirming Plaintiff's temporary total disability and requesting her to postpone Plaintiff's appeal hearings until Plaintiff was medically able to participate without damage to his health.

2) On 12-14-00, Thomas Rack, ESARO Hearing Officer, also ignored the 12-6-00 letter from Plaintiff's doctor (and ignored numerous pages of Plaintiff's medical records and governmental documents that confirmed Plaintiff's total disability status).  Mr. Rack showed his prejudice and bias by asserting his opinion that Plaintiff only requested postponements for invalid reasons (that Mr. Rack failed to specify or prove) that were not based on Plaintiff's medical needs.  Mr. Rack also agreed (by his silence) with employer's attorney who asserted that Plaintiff's total disability status from other federal and state agencies should not prevent Plaintiff from proceeding with ESARO hearings now.  After two weeks of ESARO refusals of Plaintiff's requests and pleas for postponement of Plaintiff's appeal hearings, and the Hearing Officer's clear prejudice at the 12-14-00 hearing, Plaintiff felt forced to proceed, or his claim would be denied, and Plaintiff would have no legal standing to appeal the denial.

3) In mid-December 2000 and early January 2001, Ms. Pang "knowingly misstated, misrepresented, and omitted material facts" at least 18 times to Plaintiff's four U.S. Congresspersons and Senators. Ms. Pang's 18 torts violated federal laws such as U.S.C. 1001 and similar U.S. laws prohibiting "fraud" and "false statements" to federal officials, and state laws such as H.R.S. s. 383-92 and H.R.S. s. 383-30(5) and s.710-1060 to 1063, which prohibit giving "false testimony" and "misleading information" and H.A.R. s. 12-5-67 that prohibits "false statement, or misrepresentation, or nondisclosure of a material fact." Three of the 18 torts were that: (1) Ms. Pang intentionally omitted telling these 4 federal officials the material fact that Plaintiff was legally and medically totally disabled, and (2) that Plaintiff's doctor had asked Ms. Pang, personally and in writing just a few weeks before, to postpone Plaintiff's hearings for medical reasons, but (3) that she had refused to do so. Ms. Pang and Mr. Rack had no legal basis to refuse Plaintiff's medical need for more time, yet they intentionally disregarded many laws, rules, and policies that guaranteed Plaintiff's legal and civil right for a medically-based postponement of Plaintiff's own appeal hearings.

4) On or about 12-28-00, DLIR's own legal expert on civil and legal rights, Tom Jackson (the Equal Opportunity officer and a close aide to the DLIR Director) informed Ms. Pang that under the Americans with Disabilities Act ("ADA"), and other federal and state laws, that Plaintiff had a legal right for a postponement "for as long as he medically requires." According to Mr. Jackson, Ms. Pang became angry and argued about the requirements of the law. Ms. Pang did not follow the legal advice of DLIR's own legal expert, nor did she follow the requirements of the law. Instead, she only

15

granted Plaintiff a two-week delay during which Plaintiff was forced to keep exerting himself (injuriously) to keep up with Mr. Rack's demanding hearing schedule.

5) In February 2001, the employer failed to give numerous subpoenaed documents and evidence to the Plaintiff. Hearing Officer Rack failed to uphold the law and failed to protect Plaintiff's basic legal right to evidence. Mr. Rack made no inquiry or investigation of the employer, and made no effort to obtain a single subpoenaed document from the employer.

6) On or about 2-27-01, Mr. Rack again denied Plaintiff's request, this time for just 3 days more time to exchange exhibits with employer, due to Plaintiff's medical condition worsening from the unrelenting stresses of Mr. Rack's demanding schedule. Mr. Rack showed his reckless disregard for Plaintiff's health by denying Plaintiff just 3 days more time, and also showed his contempt for Plaintiff by failing to either have an ESARO aide call Plaintiff with an urgent answer, or faxing an answer to Plaintiff. Instead, Mr. Rack scrawled "Request Denied" on Plaintiff's typed request – and carelessly left the confidential document on the ESARO counter for Plaintiff to (presumably) find when Plaintiff came to ESARO office to give a copy of his exhibits to Mr. Rack, on time. Ironically, the employer failed to give Plaintiff their exhibits by the deadline that Mr. Rack had forced Plaintiff to meet (with extreme stress and injury). When Plaintiff complained, Mr. Rack excused employer's failure by falsely claiming that Mr. Rack "would have" given Plaintiff the same leeway that Mr. Rack had, in fact, just denied Plaintiff! Mr. Rack was repeatedly blatantly self-contradictory, and when it mattered

most, he treated the employer "disparately" and preferentially over the Plaintiff. For example, from December 2000 to March 2001, Mr. Rack <u>denied all</u> but one of Plaintiff's requests for time (and only when Ms. Pang over-ruled Mr. Rack's 12-28-00 denial and told him to give Plaintiff two weeks). But during this same period, Mr. Rack <u>granted all</u> three of the employer's requests for more time, totaling six weeks (!), including interrupting the middle of the hearings.

7) On 2-28-01, Mr. Rack completed his "in camera" review of Plaintiff's 200 pages of medical records. Note that Mr. Rack thereby knew in detail that Plaintiff was, in fact, totally disabled, and that Plaintiff's health was in dire jeopardy from the stresses of preparing for, and participating in, the hearings. Mr. Rack's knowledge of Plaintiff's severe health problems that were always worsened by stress made Mr. Rack's refusal to grant Plaintiff even 3 days on 2-27-01 not only sadistic, but constituted "reckless endangerment." (In fact, from the beginning to the present, ESARO and DLIR officials have repeatedly and wrongfully endangered and damaged Plaintiff's health – to tragic and catastrophic extents.) Based on Mr. Rack's detailed knowledge of Plaintiff's medical records – and the dire risks to Plaintiff's health – Mr. Rack had a legal duty to postpone the hearings that Plaintiff's doctor had asked be postponed, and as Plaintiff had repeatedly requested be postponed. But, as always, Mr. Rack intentionally disregarded Plaintiff's medical needs and medical records, violated Plaintiff's legal and civil rights, and intentionally inflicted repeated and wrongful physical, mental, and emotional duress upon the Plaintiff by making the hearings proceed no matter what. Mr. Rack and Ms. Pang never bothered to give Plaintiff a

17

reasonable explanation of <u>why</u> they were so insistent that the hearings must proceed despite Plaintiff's severe medical condition.

8) On or about March 14, 2001, Mr. Rack violated state law, administrative rule, and agency policy by talking with the employer behind the Plaintiff's back, off the recorded record, when Plaintiff was asked by Mr. Rack to step out of the room. Mr. Rack instructed Plaintiff to call his next witness from a phone outside the hearing room. Plaintiff got the witness on the phone, came back into the hearing room, and immediately Mr. Rack told Plaintiff that he would not permit the witness to testify! Apparently the employer had objected against the witness – at the last minute, when the Plaintiff was not present, and Mr. Rack had discussed things with the employer behind Plaintiff's back and off-the-record, and disallowed the witness from testifying, without giving the Plaintiff a fair or adequate chance to argue for the witness's testimony. The witness had been approved by Mr. Rack and the employer just a month or so before, and Mr. Rack had personally subpoenaed the witness to testify. Once again, Mr. Rack's blatant self-contradictory misconduct prejudiced and harmed the Plaintiff and violated Plaintiff's legal rights for due process and a fair and full hearing.

9) On or about March 15, 2001, Mr. Rack revealed his hostility and bias against Plaintiff by loudly and angrily *yelling* at Plaintiff without good cause, and persistently attempting to prevent Plaintiff from exercising Plaintiff's fundamental constitutional right to cross-examine an employee-witness for the employer who had falsely accused Plaintiff repeatedly. Plaintiff succeeded in proving the witness had falsely accused

Plaintiff in the witness's sworn testimony. Nevertheless, Mr. Rack – as always – failed to question the witness, and failed to penalize the witness or the employer for a clear, repeated pattern of making false accusations against the Plaintiff that were disproved in the hearings, and also shortly after the hearings.

10) On May 2, 2001, Mr. Rack violated Plaintiff's fundamental legal right to review the ESARO record to prepare for the presentation of evidence at the Plaintiff's final hearings on May 7-9, 2001. Mr. Rack not only violated his own promise to Plaintiff that Mr. Rack had written in an official letter dated December 28, 2000 that "either party is free to review the file at any time," but Mr. Rack also violated the central Hawaii Revised Statute that guarantees an appellant the legal right to review the ESARO file at any time to prepare for the presentation of evidence at the appellant's ESARO hearings. Mr. Rack knew of this state statute because he mockingly cited it to Plaintiff one month later as the reason that he would not allow Plaintiff to access Plaintiff's ESARO records, saying that after the hearings the right to access expired. (Mr. Rack's denial of access was later found to be illegal. Please see below.)

11) On or about May 29 and June 5, 2001, Ms. Pang violated state law, administrative rule, and DLIR policy by failing to investigate Plaintiff's written complaint about Mr. Rack's May 2, 2001 violation of Plaintiff's basic legal right to review the ESARO file to prepare for Plaintiff's final ESARO hearings. Ms. Pang intentionally failed to question both Mr. Rack and ESARO aide Yvonne Katayama, who was a firsthand

19

witness to Mr. Rack's tort. Ms. Pang also violated her legal duty by failing to even reply to Plaintiff about this very serious complaint and violation.

12) Throughout July 2001, both Mr. Rack and Ms. Pang violated their legal duties by willfully refusing to consider Plaintiff's 150+ pages of evidence that employer's employee-witnesses had repeatedly lied under oath during Plaintiff's appeal hearing, in a coordinated and probably conspired effort to deny Plaintiff's legal rights to unemployment benefits. By refusing to even consider detailed, extensive evidence of widespread perjury by employer's four main witnesses, Mr. Rack's 7-25-01 decision denying Plaintiff benefits, was intentionally based on employer lies and omissions, and willfully denied Plaintiff a fair and full hearing.

13) On July 25, 2001, Mr. Rack issued his decision denying Plaintiff's appeal for unemployment benefits. As just stated, his decision was knowingly based on the employer's employee-witnesses' sworn oral perjury and written fraud. Mr. Rack's 7-25-01 decision also was fundamentally flawed by numerous intentional acts of error of fact, errors of law, omissions of material facts, and malicious statements of things he knew were untrue (that hurt Plaintiff's case), and not saying things that he knew were true (that would have made Plaintiff's case win). Plaintiff respectfully reserves the right to provide a full account at time of trial, but for now Plaintiff will give one major example. On pages 17-18 of Mr. Rack's 7-25-01 decision, he falsely concluded that Plaintiff did not have "good cause" to quit his job, and thus was ineligible for unemployment benefits. Mr. Rack's conclusion is demonstrably false, an error of fact

and of law, omits material facts, and reveals his extreme malice and hostility toward

the legal and civil rights of the Plaintiff.  As stated above, Mr. Rack had read over 200

pages of Plaintiff's medical records.  Mr. Rack knew that Plaintiff was totally disabled

on the job by the working conditions and the bosses' abuse of the Plaintiff.  Mr. Rack

knew that 6 independent doctors, the State of Hawaii Department of Human Services,

and the U.S. Social Security Administration all agreed that Plaintiff was totally

disabled as of October 14, 1999, Plaintiff's very last day on the job.  Mr. Rack knew

that Plaintiff never worked since that last day on the job, and likely never would work

again (which is now confirmed).  Mr. Rack knew that Plaintiff had been made

chronically ill during the job and by the job, and was acutely ill at the time Plaintiff

was forced to quit his job involuntarily, for health reasons.  Mr. Rack also knew that

Plaintiff was acutely ill for an entire month after Plaintiff quit his job.  And Mr. Rack

knew that Plaintiff was severely ill, both physically and emotionally, an entire year

later, in September 2000, just 90 days before Mr. Rack started forcing Plaintiff through

the extremely stressful appeal process.  (The official ESARO records even hold

evidence that Mr. Rack withheld Plaintiff's medical records by Dr. Stanley Luke that

proved that Plaintiff was too ill and disabled to prepare for, or participate in, the 6-

month long hearings without damaging his health.)  But Mr. Rack intentionally and

maliciously omitted all of these centrally material facts from his "decision."  Mr. Rack

did not admit a single one of these vital facts in his decision.  Why?  Because

individually and collectively these facts actually prove what Mr. Rack refused to

admit:  that the Plaintiff was forced to quit his job involuntarily for health reasons –

and therefore was legally eligible to receive unemployment benefits.  Hawaii

Administrative Rules s. 12-5-47 states that "Good cause for leaving employment may be found where there is: (1) <u>Change in working conditions and the change is prejudicial or detrimental to the health, safety, or morals of the claimant</u>; (2) Change in terms and conditions of employment, including, but not limited to: change in rate of pay, position or grade, duties, days of work, or hours of work;" (etc.)  Plaintiff proved in the ESARO hearings that he met these two criteria.  (Only one criterion is required to be eligible for unemployment benefits.)  But criterion number one, involving "changes in work conditions that are detrimental to the health and safety of the claimant" -- Plaintiff met this criterion overwhelmingly and irrefutably.  Plaintiff's health was legally and medically "totally disabled" as of his last day on the job, on October 14, 1999.  And Mr. Rack's and Ms. Pang's and DLIR's hostile, prejudiced, malicious, systematic, and collaborative torts forced Plaintiff through so many stresses, of such severity, for so long that Plaintiff's "total disability" is now catastrophic and permanent.

14) From May 2, 2001 through May 2002, Mr. Rack and Ms. Pang violated state law, administrative rule, and DLIR policy by denying Plaintiff's written requests to access and copy parts of Plaintiff's own ESARO records (initially the tapes and later the entire record) for the legitimate purposes of :  A) filing a crime report of perjury and fraud by the employer's witnesses; B) presenting evidence in Small Claims Court for wages wrongfully withheld by employer from Plaintiff; and C) preparing Plaintiff's case and opening brief in a state court appeal of  Mr. Rack's wrongful denial of benefits.  Mr. Rack and Ms. Pang had blatant conflicts-of-interest, because they legally

and ethically should not have withheld evidence that would have defeated their own decision and would have impugned their own conduct. But, as always, Mr. Rack and Ms. Pang failed to recuse themselves and let an impartial DLIR official decide Plaintiff's request to access and copy Plaintiff's own ESARO records. Mr. Rack's and Ms. Pang's 13 denials of Plaintiff's requests to access records not only violated H.R.S. law (each violation warrants a $1,000 fine), but also caused Plaintiff extreme stress and injury to his health as Plaintiff struggled in vain to get several state officials and agencies to uphold state law and gain access for Plaintiff to his own records, in accord with H.R.S. 92, 92F, and 383-?.

15) In November 2001, Mr. Rack violated a subpoena by refusing again to give copies of the tapes of Plaintiff's ESARO hearings to Plaintiff for evidence in the above-mentioned Small Claims Court unpaid wages case. Mr. Rack went so far as to go to the court, grossly misrepresented Plaintiff's actions and intentions regarding the ESARO tapes, and then waited for an opportunistic moment (when the Plaintiff was talking with employer's attorney and could not hear Mr. Rack talking to the judge) whereupon Mr. Rack sneakily asked the judge to quash the subpoena. The judge granted Mr. Rack's request, and Plaintiff being caught off guard, Plaintiff acquiesced to the judge's decision, without being able to criticize Mr. Rack's facts or tactics. Mr. Rack thereafter misrepresented the facts in a gloating letter to the Office of Information Practices ('OIP") and to the DLIR in an internal memo. This incident further reveals Mr. Rack's <u>pattern</u> of suppressing and withholding of evidence,

violating Plaintiff's legal rights, shamelessly deploying deceitful tactics to get what he
wants, and lying to courts and other government officials.

16) In January 2002, Mr. Rack lied to the state circuit court in a written statement that the
ESARO records sent to the court were accurate and complete, when they were not.
Despite the "Designation of Record on Appeal" and the court's "Order for
Certification and transmission of Record," Mr. Rack and Ms. Pang intentionally
withheld from the court all of the audio tapes, which were specifically ordered to be
sent to the court in item # 22 of the aforementioned "Designation of Record on
Appeal." In addition, Mr. Rack intentionally concealed the important document cited
above (his letter to Plaintiff dated December 28, 2000 promising Plaintiff access "to
review the file at any time"). This key evidence should have been listed individually in
the ESARO Table of Contents – but it intentionally was not listed at all. It took the
Plaintiff several months to discover by chance that this document was hidden among a
group of documents in the ESARO record. Mr. Rack had also previously written a
note to ESARO aides to withhold some of Plaintiff's vital medical evidence from the
ESARO records and the Plaintiff in the ESARO hearings. This tortious pattern of
withholding and denying the existence of essential evidence is being repeated by DLIR
currently. (Please see below.)

17) In March or April 2002, DLIR's Deputy Attorney General, Frances Lum, and Ms.
Pang got into a month-long bitter legal-argument over whether Plaintiff had a legal
right to a copy of Plaintiff's ESARO records. Ms. Pang lost the legal argument, and

thus, had committed torts 13 times and for an entire year by denying all of Plaintiff's written requests to access and copy Plaintiff's ESARO records.

18) In March or April 2002, after Ms. Pang lost the legal argument, she nervously asked DLIR's legal expert, Tom Jackson (whose legal advice on this very issue Ms. Pang angrily disregarded in December 2000) whether she had violated Plaintiff's legal and civil rights. DLIR's Deputy Attorney General, Frances Lum, violated DLIR policy and standard procedures (and probably state laws) by intervening and instructing Mr. Jackson not to give Ms. Pang his legal answer to her question in writing – but only orally. Ms. Lum thus violated Plaintiff's legal and civil rights herself by preventing a "smoking gun" document and evidence from being created by Mr. Jackson. Because, Mr. Jackson carefully reviewed the law and informed Ms. Pang that, in fact, Ms. Pang and Mr. Rack had violated Plaintiff's legal and civil rights at least 13 times for the entire year of May 2001 through May 2002. Obviously, <u>Plaintiff's current allegations would have been confirmed by DLIR's own legal expert if Deputy Attorney General Lum had not prevented Mr. Jackson from writing a document stating DLIR violated Plaintiff's legal and civil rights</u>! This is yet another example that the DLIR is not respecting and acting in accordance with the law – but that many DLIR officials collaborated to commit torts and violate the legal and civil rights of Plaintiff – even Deputy Attorneys General!

19) In March or April 2002, after Ms. Pang lost the legal argument, she was instructed by the DLIR Director to give the Plaintiff a complete record of Plaintiff's ESARO

records.  Ms. Pang intentionally did not make it a priority and delayed at least a month

in fully completing the DLIR Director's orders.  Ms. Pang had to be told a second

time, emphatically, to do it right away.  Plaintiff did not get all his records until about

May 20, 2002 (after an entire year and about 15 requests).

20) On October 7, 2002, both Ms. Pang and Mr. Rack submitted written statements to

federal investigators at the U.S. Department of Labor's Civil Rights Center ("CRC")

who were investigating Plaintiff's civil rights complaint.  In response to CRC

interrogatory question #19, Ms. Pang submitted a one-page statement to CRC, and Mr.

Rack submitted a 5½ page statement to CRC.  Plaintiff has only recently received this

evidence, as a result of Plaintiff's own Freedom of Information Act request to DLIR on

July 13, 2006.  As a result of the recent receipt and Plaintiff's disabled condition,

Plaintiff has not yet been able to analyze these documents in detail.  However, an

initial, cursory "skimming" of both documents makes it appear that both Ms. Pang and

Mr. Rack have "knowingly made misstatements, misrepresentations, and omissions of

material facts" to federal officials for the purpose of "misleading" and "defrauding"

these officials, and to deny and escape legal liability for Ms. Pang's and Mr. Rack's

violating Plaintiff's legal and civil rights, and financial liability for damaging

Plaintiff's health and life catastrophically and permanently.  First, Ms. Pang and Mr.

Rack have a long and provable record of lying to 4 U.S. Congresspersons and

Senators, a state small claims court judge, the OIP, the DLIR itself, a state circuit court

judge, and CRC federal investigators.  (With this lengthy pattern and *modus operandi*,

Plaintiff respectfully request this federal court to be alert for DLIR's "misstatements,

misrepresentations, and omissions of fact," and DLIR's withholding and concealing of

evidence, as this case proceeds.) Second, both Ms. Pang and Mr. Rack intentionally

"omitted the material fact" to CRC that DLIR's own legal expert, Mr. Jackson had

given Ms. Pang his considered legal opinion that "Ms. Pang and Mr. Rack had violated

Plaintiff's legal and civil rights 13 times for an entire year," (at the very least and

possibly more). Mr. Jackson had informed Ms. Pang of this legal determination in

around May 2002, that is, only 4 or 5 months before Ms. Pang's and Mr. Rack's

statements to CRC. It is likely that Ms. Pang then told Mr. Rack, her close subordinate

and collaborator in violating Plaintiff's legal rights numerous times over the previous

1¾ years. Thus, both Ms. Pang and Mr. Rack added lying and omitting material facts

to federal investigators at CRC to their many violations of U.S.C. 1001 and the many

other similar federal and state laws listed in # 3 of this list. Their over-riding motive

seems to be to avoid legal liability at all costs. At trial, Plaintiff will provide a full list

of the many "knowing misstatements, misrepresentations, and omissions of material

fact" that Ms. Pang and Mr. Rack committed tortiously in their statements to federal

investigators at CRC on October 7, 2002.


21) In September 2003, Ms. Pang also lied to the state judge that she did not know the

audio tapes needed to be sent to the court. Ms. Pang lied to the court because not only

were the tapes clearly ordered to be sent to the court in item #22 of the "Designation of

Record on Appeal" that was served on ESARO (of which Ms. Pang is Supervisor), but

in addition, Plaintiff emphatically and repeatedly reminded ESARO of the court order

for all of the audio tapes of Plaintiff's ESARO hearings in a letter to Mr. Rack in

August or September 2001, and in two or three Motions that Plaintiff sent copies of to
ESARO, where Ms. Pang is Mr. Rack's Supervisor. It is inconceivable that Ms. Pang
(and Mr. Rack) "did not know" they were court-ordered to send the tapes to the court.
Ms. Pang finally sent the tapes to the court – two years late, and at 4:15 P.M. the
Friday before the court hearing the next Monday at 8:15 A.M., thus making it
impossible for the judge to listen to any part of the tapes (like Mr. Rack's ugly yelling
at Plaintiff on March 15, 2001).

22) In or around March 2005, Mr. Rack wrote to CRC to inquire about the progress and
outcome of CRC's investigation of Plaintiff's civil rights complaint against ESARO
and DLIR. By contacting CRC on this case, Mr. Rack "re-opened the door" for statute
of limitations purposes on his torts against Plaintiff. Mr. Rack had a legal duty to
inform CRC, albeit belatedly by 2½ years, that DLIR's Mr. Jackson had told Ms. Pang
that she and Mr. Rack had, in fact, violated Plaintiff's legal and civil rights at least 13
times for an entire year. But once again, Mr. Rack knowingly omitted this fact that
was, and still is, very material to CRC's investigation of Mr. Rack, Ms. Pang, and
DLIR. Again in March 2005, Mr. Rack violated U.S.C. 1001 and many similar federal
and state laws that make it a felony and a fineable offence to knowingly withhold
material facts. Again, Mr. Rack is a government official who not only violated the law
in Plaintiff's hearings that he controlled, but Mr. Rack is a public official who
routinely lies to other officials!

23) On August 17, 2006, DLIR finally responded to Plaintiff's FOIA request of July 13,

2006. Once again in the long DLIR pattern, DLIR not only withheld most of the

documents that Plaintiff requested under federal and state laws, but DLIR also coyly

claims that "we do not have and do not know whether some of the documents you

requested ever existed." Note that DLIR fails to inform Plaintiff specifically which

documents do not still exist; whether they were stolen, destroyed or lost; what

documents do exist but DLIR is withholding from Plaintiff; what legal basis, if any,

exempts the release of which documents; and other specific facts Plaintiff requires in

order to continue his pursuit of essential evidence in the current lawsuit. To add insult

to injury, DLIR sent Plaintiff a bill for $148.05 – even though Plaintiff has been

granted "pauper" status by this federal court, and formally requested DLIR to waive all

fees because Plaintiff is using the documents for personal use and eventually in the

public interest (to learn how government works and the need for reform). Plaintiff will

be requesting this court to subpoena the documents that DLIR is refusing to release,

and even refusing to identify. For example, in #17 above, Ms. Lum and Ms. Pang each

wrote a long legal memorandum to the DLIR Director arguing their differing positions

on Plaintiff's request to access and copy Plaintiff's ESARO records. Plaintiff has

requested copies of these two memos, in part to show Ms. Pang's failure to maintain

her legally-required "total impartiality" toward Plaintiff's case and legal rights – and

also to show Ms. Pang's way of thinking about individual rights and her way of

interpreting the law, and how her way differs on these points with Deputy Attorney

Lum's. Since Ms. Pang was legally wrong in her thinking and actions toward Plaintiff,

it may prove "material" to Plaintiff's allegations that she and Mr. Rack violated

Plaintiff's legal and civil rights. Plaintiff believes his legal rights and needs in the current lawsuit far outweigh DLIR's right to keep secret "internal memos" -- especially when DLIR is accused of committing systematic torts against the Plaintiff, with catastrophic results.

24) In conclusion, even this partial list shows that DLIR intentionally and repeatedly violated Plaintiff's legal and civil rights numerous times from at least December 2000 through the present, September 2006 (and ongoingly, as DLIR withholds and denies the existence of essential evidence in this lawsuit). Clearly, the statute of limitations has not expired on all of these torts, and all of the provable facts are necessary as connected evidence to show this fundamental fact: that many DLIR officials have committed torts against the Plaintiff in a systematic, collaborative, institutionalized manner that the courts must end, because DLIR benefits from its tortious, secretive status quo.


III.    Plaintiff's Damages and Losses – and Financial Compensation Sought

In the interests of both time and space, Plaintiff will not list every damage and loss that Defendant has wrongfully caused Plaintiff. The purpose of the following list is to give this Honorable Court, and the Defendants, a fair idea of Plaintiff's damages and losses in this complaint. Again, Plaintiff respectfully reserves the right to elaborate the details and to complete this list at the time of trial.


1) Financial compensation for each and every one of Defendant's torts against Plaintiff, and for the wrongful deprivation of the Plaintiff's legal and civil rights,

and all of the hardships and harm to Plaintiff that directly and indirectly resulted, and will result, from the effects of Defendant's torts against Plaintiff.

2) Plaintiff respectfully requests this Court to consider the exhibit previously submitted to this court entitled, "James A. Barch's 156 Disability and Disease Symptoms (as of June 15, 2006)" to be listed here in its entirety.

3) Plaintiff's loss of "enjoyment of life."

4) Loss of Plaintiff's previous, 30 years of very high level of daily athletic recreation, fun, happiness, health, and fitness.

5) Loss of Plaintiff's enjoyment (and even interest in) many other non-sport recreational and cultural activities.

6) Plaintiff being forced to change from being out-of-doors and highly social for 44 years, to being shut-in and alone and lonely for the past 7 years.

7) Loss of Plaintiff's 4 closest friends, some best friends of 22 and 14 years' duration, plus a former girlfriend.

8) Numerous painful conflicts and strains in Plaintiff's previously harmonious and close relations with his parents and brothers.

31

9)   Loss of all of Plaintiff's professional colleagues.

10) Loss of all of Plaintiff's engagement with his local community

11) Loss of all of Plaintiff's faith and trust in people generally.

12) Loss of all of Plaintiff's faith and trust in government and people in power.

13) Loss of Plaintiff's entire social life (except for family and doctors).

14) Loss of Plaintiff's romantic life for 7 years.

15) Severe and permanent reduction in Plaintiff's ability to enter into, and maintain, happy romantic relations, including especially, Plaintiff's desire to be married.

16) Severe and permanent reduction in Plaintiff's ability to enter into, and maintain, happy friendships.

17) Plaintiff's permanent loss of professional, collegial relationships.

18) Plaintiff's permanent loss of his chosen profession, to be a psychotherapist, for which he spent 26 years educating and training himself to become an excellent psychotherapist, with much knowledge and skills that helped other people, and

gave Plaintiff profound satisfaction and self-respect. Loss of latter satisfaction helping others and of self-esteem. In their place, Defendant wrongly caused Plaintiff to become permanently unable to work any job at all, to feel ill and function poorly all the time, and to be a burden on his family and his society.

19) Wasted days and a wasted life. Because Plaintiff is so ill and disabled all of the time, 95% of Plaintiff's days are spent suffering and struggling. It is very difficult, painful, and exhausting for Plaintiff to be either productive or playful. Plaintiff's existence is miserable and monotonously empty, where before it was full and satisfying.

20) Loss of Plaintiff's previous and desired personality. For 44 years, Plaintiff was, overall, extremely healthy, happy, energetic, enthusiastic, and actively engaged in numerous professional, educational, social, and recreational activities. Due to Defendant's abusive and traumatic damages and losses caused to Plaintiff, Plaintiff is not his old self. He is chronically ill, totally disabled, profoundly miserable, and because of Post-Traumatic Stress Disorder, chronically prone to angry outbursts when he feels mistreated. Before, Plaintiff had high tolerance for stress – which is what led to his health being destroyed: if Plaintiff had not had the strength and endurance to work a terrible job for an entire year or to fight a terrible state government for 6¾ years (and counting), but had been a "quitter," ironically, Plaintiff would still have his previous good health.

21) Loss of wages and income. Plaintiff has a Master's Degree in Clinical Psychology, and was a top student and top professional among his stage-equivalent peers. Starting at $35,000 annual full-time income and eventually reaching $70,000 annual income seems to have been a reasonable lifetime expectation. Thus, an average of $50,000 per year for 20 to 25 years of lost working years (Plaintiff was disabled at age 44 and probably would have worked until age 64 or 69, nowadays), means that Plaintiff's lost lifetime earnings would have been $1,000,000 to $1,250,000.

22) Instead, Defendant has wrongfully caused Plaintiff to be restricted to a mere $800 to $856 per month for the last 7 years – and a comparable pittance for the next 30 or 40 years of Plaintiff's life. Furthermore, Defendant has wrongfully made Plaintiff totally dependant on Social Security for income, and on Medicare and Medicaid for medical treatment and medications, in an era when all 3 programs are in financial crises, which will only get worse during Plaintiff's life, due to the retirement of the Baby Boom generation, and the catastrophic deficit created by the current Administration and Congress. If Plaintiff is denied fair and full financial compensation from Defendant, Plaintiff will wrongly suffer not only 30 to 40 years of destroyed health, pain and suffering, and a wasted life, but abject poverty as well – and the Defendant will have truly "gotten away with murder" of Plaintiff's health and life.

23) Plaintiff's 156 symptoms caused by Defendant include several dangerous and degenerative diseases, like autoimmune diseases of the eyes and ears, arthritis-like pain and loss of range of motion and mobility, diabetes, etc. Many of Plaintiff's illnesses are medically proven to interact and eventually cause additional, severe illnesses, like heart disease, stroke, dementia, kidney and liver disease, and blindness. Already Plaintiff has developed two retinal diseases and cataract formation. Taken altogether, it is very likely that Defendant not only has caused Plaintiff 156 disease and disability symptoms, and all the resulting pain and suffering and loss of feeling and functioning and enjoyment of life –but that most likely the Defendant has set in motion disease processes that will also shorten the duration of Plaintiff's life.

24) For all of the above damages and losses (and several more that Plaintiff will specify at trial), and for all of the above torts by the Defendant, and especially because of the intentional and malicious, systematic and collaborative, and repetitive and prolonged nature of the Defendant's tortious misconduct against the Plaintiff, the Plaintiff is seeking punitive damages, as well as special and general damages, totaling $5 million from the DLIR and the State government of Hawaii. Partly this amount is meant, not only to financially compensate the Plaintiff for all of his many catastrophic losses and sufferings, but also to strongly induce DLIR and the State of Hawaii to completely reform its thoroughly corrupt and arrogant institutionalized prejudice and hostility against its individual citizens, and its unjust favoritism toward employers and business, from whom the government gets most

of its tax money and campaign contributions.  The State of Hawaii in general, and

the DLIR in particular have terrible reputations of corruption and unfairness to the

individual seeking unemployment and workers compensation benefits.  And just

like the Felix v. Waihee lawsuit, it will take the intervention of the federal court to

force the DLIR and the State of Hawaii to reform itself, to follow the law, and to

respect the legal and civil and human rights of its most vulnerable citizens.


I declare under penalty of perjury that the foregoing is true and correct.


WHEREFORE,  Plaintiff prays that judgment be entered in his favor and against the

Defendant, as follows:

1)  For special, general, and punitive damages, in the mount of $5,000,000; and

2)  For prejudgment interest at the legal rate, a reasonable attorney's fee, and

taxable costs, and such other further relief as the Court deems just in the

premises.


DATED:      Los Gatos, California, September 27, 2006


*James A. Barch*

JAMES A. BARCH

Plaintiff Pro Se


36

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JAMES A. BARCH, | ) | CIVIL NO. 04-00712 SOM-BMK |
| Plaintiff, | ) | (Other Civil Action) |
| vs. | ) | |
| STATE OF HAWAII DEPARTMENT OF LABOR | ) | SUMMONS FOR PLAINTIFF'S |
| & INDUSTRIAL RELATIONS; | ) | CORRECTED AMENDED |
| Defendants. | ) | COMPLAINT |

### SUMMONS FOR PLAINTIFF'S CORRECTED AMENDED COMPLAINT

STATE OF HAWAII

TO THE ABOVE-MENTIONED DEFENDANT:

      YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff Pro Se, JAMES A. BARCH, whose address is 16101 Escobar Avenue, Los Gatos, California 95032, an answer to the Complaint which is herewith served upon you, within (twenty) 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in Complaint.

      This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.

      A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.

      DATED: Honolulu, Hawaii, _____

_____

CLERK OF THE ABOVE-ENTITLED COURT